804 So.2d 679 (2001)
Thomas ADAMS and Nancy Adams Individually and on Behalf of Jason Adams
v.
PARISH OF EAST BATON ROUGE and State of Louisiana, Through the Department of Transportation and Development.
George R. Ellis and Ronda J. Ellis
v.
Charles Lee Buhler, Individually and as Administrator of the Estate of His Minor Son, Matthew C. Buhler, State Farm Mutual Automobile Insurance Company, Parish of East Baton Rouge, and State of Louisiana, Through the Department of Transportation and Development.
Randall K. LeBlanc and Lacy W. LeBlanc
v.
Parish of East Baton Rouge and State of Louisiana, Through the Department of Transportation and Development.
Charles L. Buhler and Linda F. Buhler
v.
Parish of East Baton Rouge and State of Louisiana, Through the Department of Transportation and Development.
No. 2000 CA 0424, 2000 CA 0425, 2000 CA 0426, 2000 CA 0427.
Court of Appeal of Louisiana, First Circuit.
November 14, 2001.
Rehearing Denied January 11, 2002.
*683 Joseph J. McKernan, Gordon J. McKernan, Baton Rouge, for Plaintiffs-Appellees Thomas and Nancy Adams.
*684 Sandrea L. Everett, San Diego, CA, for Plaintiffs-Appellees George R. and Ronda J. Ellis.
John W. Degravelles, Baton Rouge, for Plaintiffs-Appellees Randall K. and Lacy W. LeBlanc.
Andre C. Broussard, Baton Rouge, for Plaintiffs-Appellees Charles L. and Linda F. Buhler.
Frank J. Gremillion, Baton Rouge, for Defendants-Appellants City of Baton Rouge and Parish of East Baton Rouge.
Henry Terhoeve, Kevin Landreneau, Baton Rouge, for Intervenor-Appellee State Farm Mutual Automobile Insurance Company.
Before: WHIPPLE, PETTIGREW, and DOWNING, JJ.
PETTIGREW, Judge.
These consolidated cases, involving claims for damages resulting from personal injuries and two fatalities, arise out of the same vehicular collision. Following a lengthy trial, the jury returned a verdict in favor of the defendant, the Parish of East Baton Rouge[1] (Parish), finding no negligence on the part of the Parish. Thereafter, upon motion by all of the plaintiffs, the trial court granted a judgment notwithstanding the verdict (JNOV) and awarded the plaintiffs judgments totaling $3,778,004.80. The trial court also conditionally granted plaintiffs' motion for a new trial. The instant appeal by the Parish followed. We amend, and as amended, affirm.

FACTS
On May 10, 1993, Matthew Buhler was operating a 1984 Toyota truck owned by his mother, Linda F. Buhler, in a northeasterly direction on Louisiana Highway 3034, which is generally known as Sullivan Road, in East Baton Rouge Parish, Louisiana. Jason Adams and Jason LeBlanc were guest passengers in the Buhler vehicle. Shortly after 2:30 p.m., Matthew Buhler attempted to negotiate a curve in the roadway near Sparkle Drive ("Sparkle Drive curve") and lost control of his vehicle. The Buhler vehicle ultimately crossed the centerline into the path of on-coming traffic, striking another vehicle. The other vehicle involved in the collision, a 1992 Ford pickup truck, was owned and operated by George R. Ellis. As a result of this accident, Jason Adams and George Ellis sustained serious injuries, and Matthew Buhler and Jason LeBlanc were killed.

PROCEDURAL HISTORY
Following this tragic accident, four separate lawsuits were filed and later consolidated for trial. On September 21, 1993, Thomas and Nancy Adams, individually and on behalf of their minor son, Jason, filed an action for damages, naming as defendants the Parish and the State of Louisiana, through the Department of Transportation and Development (DOTD). The Adamses alleged that the roadway, shoulder, and guardrail were owned and maintained by the Parish and/or DOTD, each of which was either negligent or strictly liable. The Parish filed an answer, *685 generally denying the allegations of the petition. In an amended answer, the Parish alleged that the accident and damages occurred as a result of victim fault or the negligence of a third person. DOTD answered the petition, generally denying the allegations of the petition and alleging lack of notice, victim fault, and third-party fault.[2] Thereafter, DOTD filed a cross-claim against the Parish, alleging tort indemnity.[3]
On April 12, 1994, Randall K. and Lacy W. LeBlanc filed an action for damages and for the wrongful death of their son, Jason. Named as defendants in the Le-Blanc suit were the Parish and DOTD. The LeBlancs alleged that the roadway, shoulder, and guardrail were owned and maintained by the Parish and/or DOTD, each of which was either negligent or strictly liable and both of which were solidarily liable with the other. The Parish answered the LeBlancs' petition, generally denying all of the allegations. DOTD filed an answer, generally denying the allegations of the petition and alleging lack of notice, victim fault, and third-party fault. DOTD also filed a cross-claim against the Parish, alleging indemnity.
On February 18, 1994, George R. and Ronda J. Ellis filed an action for damages, naming as defendants Charles Lee Buhler, the father and administrator of the estate of his minor son, Matthew Buhler, and State Farm Mutual Automobile Insurance Company (State Farm), the Buhlers' liability insurer.[4] In their petition, the Ellises alleged that the accident was caused by the negligence of Matthew Buhler. State Farm filed a general denial and alleged that Ellis was negligent and that third parties, namely those entities responsible for maintaining the roadway, were at fault. On May 9, 1994, the Ellises amended their petition to add the Parish and DOTD as additional defendants, alleging the accident occurred as a result of the negligence and fault of the Parish and/or DOTD in designing, constructing, and maintaining Sullivan Road, including its shoulder and the guardrail. The Parish answered the amended petition, generally denying all of the allegations. DOTD also answered the amended petition, generally denying the allegations of the petition and alleging the negligence of Matthew Buhler and the Parish. DOTD also alleged that Sullivan Road, at the site of the accident, was not part of the State highway system, but was part of the parish highway system.
On May 3, 1994, Charles L. and Linda F. Buhler filed an action for damages and for the wrongful death of their son, Matthew. Named as defendants in the Buhler suit were the Parish and DOTD. The Buhlers alleged that the roadway, shoulder, and guardrail were owned and maintained by the Parish and/or DOTD, each of which was either negligent or strictly liable. DOTD answered the petition, generally denying the allegations of the petition and alleging lack of notice, victim fault, and *686 third-party fault. The Parish filed a general denial and alleged that the accident and damages occurred as a result of victim fault or the negligence of a third person. DOTD filed a cross-claim against the Parish, alleging tort indemnity.
The matter proceeded to trial in July of 1997. After hearing the evidence, the jury rendered a verdict in favor of the Parish, finding no negligence on the part of the Parish and assigning 100 percent of the fault for the accident to Matthew Buhler. Subsequently, on September 26, 1997, the plaintiffs moved for a JNOV or, in the alternative, for a new trial. This motion was heard by the trial court on November 24, 1997, at which time the court granted a JNOV in favor of the plaintiffs and conditionally granted the plaintiffs' motion for a new trial in the event that the JNOV was vacated or reversed on appeal. After considering the post-trial briefs submitted by the plaintiffs regarding quantum, the trial court issued written reasons for judgment on January 13, 1999. Thereafter, on November 8, 1999, the trial court signed a judgment awarding damages to the plaintiffs as follows:

Randall K. LeBlanc $ 350,000.00 (general damages)
Lacy W. LeBlanc $ 350,000.00 (general damages)
Randall K. and Lacy W. LeBlanc $ 5,409.88 (special damages)
Charles L. Buhler $ 350,000.00 (general damages)
Linda F. Buhler $ 350,000.00 (general damages)
Charles L. and Linda F. Buhler $ 6,359.79 (special damages)
George R. Ellis $ 275,000.00 (general damages)
George R. Ellis $ 42,789.12 (special damages)
Ronda J. Ellis $ 20,000.00 (general damages)
Jason Adams $1,250,000.00 (general damages)
Jason Adams $ 603,446.20 (special damages)
Nancy Adams $ 100,000.00 (general damages)
Thomas Adams $ 75,000.00 (general damages)

It is from this judgment that the Parish has appealed, assigning error to the trial court's judgment granting a JNOV and a conditional new trial. The LeBlancs have answered the appeal, urging this court to increase the trial court's award of damages for their mental anguish, suffering, and grief over the loss of their son.

JUDGMENT NOTWITHSTANDING THE VERDICT
The article controlling the use of a motion for a JNOV is La.Code Civ. P. art. 1811. Article 1811 provides, in pertinent part, as follows:
A. (1) Not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of judgment under Article 1913, a party may move for a judgment notwithstanding the verdict. If a verdict was not returned, a party may move for a judgment notwithstanding the verdict not later than seven days, exclusive of legal holidays, after the jury was discharged.
(2) A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.
B. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict. If no verdict was returned, the court may render a judgment or order a new trial.

*687 C. (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.
(3) If the motion for a new trial has been conditionally denied and the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.
A JNOV may be granted on the issue of liability, damages or both. La. Code Civ. P. art. 1811(F). The standard to be used in determining whether a JNOV has been properly granted has been set forth in our jurisprudence as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Davis v. Wal-Mart Stores, Inc., XXXX-XXXX, p. 4 (La.11/28/00), 774 So.2d 84, 89 (citations omitted). See also Smith v. Davill Petroleum Company, Inc., 97-1596, p. 4 (La.App. 1 Cir. 12/09/98), 744 So.2d 23, 26-27.
In general, the standard of review of a JNOV on appeal is twofold. First, we must determine whether the jury verdict is supported by competent evidence and is not wholly unreasonable. To make this determination, we must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Daigle v. United States Fidelity and Guaranty Insurance Company, 94-0304, pp. 6-7 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 436.

LIABILITY
On the issue of liability, the trial court charged the jury both on a standard of negligence under La. Civ.Code art. 2315 and on strict liability under La. Civ.Code art. 2317. The owner or person having custody of immovable property has a duty to keep such property in a reasonably safe condition. This person must discover any unreasonably dangerous condition on the premises and either correct the condition or warn potential victims of its existence. This duty is the same under both the strict liability theory of Article 2317 and the negligence liability theory of Article 2315. *688 McAllister v. Coats, 96-1069, p. 7 (La.App. 1 Cir. 3/27/97), 691 So.2d 305, 309, writ denied, 97-1356 (La.9/5/97), 700 So.2d 513.
Although these two theories constitute separate and distinct avenues of relief for damage resulting from a dangerous condition on the premises of another, the analysis used by the courts when applying the two theories is similar. Under either theory, the plaintiff must prove: (1) the thing that caused the damage was in the custody of the defendant; (2) the thing contained a defect, that is, a condition that created an unreasonable risk of harm to the plaintiff; and (3) the defective condition of the thing caused the plaintiff's injuries.[5] In essence, the only difference between the negligence theory of recovery and the strict liability theory of recovery is that the plaintiff need not prove the defendant was aware of the existence of the defect under the strict liability theory.[6] Under the negligence theory, it is the defendant's awareness of the dangerous condition of the property that gives rise to a duty to act. Under a strict liability theory, it is the defendant's legal relationship with the property containing a defect that gives rise to the duty. Dennis v. The Finish Line, Inc., 99-1413, 99-1414, pp. 5-6 (La. App. 1 Cir. 12/22/00), 781 So.2d 12, 20-21, writ denied, XXXX-XXXX (La.3/16/01), 787 So.2d 319. Under both theories, the absence of an unreasonably dangerous condition of the thing implies the absence of a duty on the part of the defendant. Oster v. Department of Transportation and Development, State of Louisiana, 582 So.2d 1285, 1288 (La.1991).
In reaching the conclusion that the Parish was not negligent in the instant case, the jury considered the following issues: 1) Did either the road surface or the guardrail or a combination of both present a defective condition? 2) Did the Parish have actual or constructive knowledge of the defect in either the road surface or the guardrail or a combination of both, and *689 have a reasonable opportunity to correct one or both? 3) Was either the road surface or the guardrail or a combination of both a proximate cause of the accident? The jury answered all three questions in the negative and ultimately concluded that Matthew Buhler was 100 percent at fault in causing the accident.
The trial court subsequently rendered a JNOV in favor of the plaintiffs. In a judgment dated November 8, 1999, the trial court prefaced its damage awards with the following language:
After considering the evidence presented at the trial on the merits of this matter, the Memoranda in Support of and in Opposition to the Motion for Judgment Notwithstanding the Verdict and, In the Alternative, Motion for New Trial, the post-trial briefs submitted by all parties and the argument of counsel, the Court, finding that reasonable minds could not have reached the conclusions expressed by the jury and finding the law and the evidence to be in favor of plaintiffs, and against defendants, and for reasons given orally in open Court and reflected in the Court's Written Reasons, the Motion for Judgment Notwithstanding the Verdict is granted ....
In addition to the reference to "reasons given orally in open Court" contained in this judgment, the court minutes from the November 24, 1997 hearing on the JNOV and motion for new trial also indicate that oral reasons were assigned. However, if oral reasons were in fact given, the record is devoid of any transcript of same. Rather, all that is contained in the record before us is the court's "Written Reasons" for judgment dated January 13, 1999, and the November 8, 1999 judgment. In its "Written Reasons," the court merely lists the various damages awarded to the plaintiffs, which listing is preceded by the following language: "After considering the evidence presented in this matter and the post trial briefs submitted by all parties, this Court awards damages in this matter as follows." There are no additional reasons for judgment offered by the trial court. Without the benefit of more extensive reasons for the trial court's grant of a JNOV, we can only assume that the "conclusions expressed by the jury" mentioned by the court in the November 8, 1999 judgment refers to the jury's decision that neither the road surface nor the guardrail were defective. Because the trial court gave no specific reasons why it determined that the jury verdict was contrary to the evidence, we must examine all the evidence to determine whether the trial court abused its discretion. See Martin v. Heritage Manor South Nursing Home, XXXX-XXXX, p. 7 (La.4/3/01), 784 So.2d 627, 633. Thus, our inquiry becomes whether the JNOV granted by the trial court was proper as to both alleged defects, i.e., the condition of the roadway and the guardrail.
In assessing this case, using the criteria set forth above, we must determine whether the facts and inferences point so strongly in favor of a finding that the Parish was negligent and that this negligence was a proximate cause of the accident. If the answer is yes, the trial court was correct in granting the JNOV because no reasonable jury could have found to the contrary. If, however, the answer is no, the trial court was in error in granting the motion and the jury verdict should be reinstated. Following an exhaustive review of the record in the instant case, we conclude that the evidence overwhelmingly warrants a finding that the Parish was liable for this accident. The evidence presented to the jury regarding the condition of the roadway in question pointed so strongly in favor of the plaintiffs such that fair and impartial jurors *690 could not have reasonably concluded otherwise.[7]
With regard to the issues of negligence and strict liability, the jury heard from numerous witnesses. There was no question that Sullivan Road was in the care, custody, and control of the Parish at the time of this accident. Evidence at trial established that DOTD relinquished custody of Sullivan Road to the Parish in August of 1987. The Parish not only took control of Sullivan Road at that time, but also assumed all responsibility for maintenance, signage, and upkeep of the roadway. Thus, the critical issues become whether the condition of Sullivan Road created an unreasonable risk of harm under the circumstances of this case and whether same was a proximate cause of the accident. If the condition of Sullivan Road did present an unreasonable risk of harm to the plaintiffs and was a cause-in-fact of the accident, then the Parish, by definition, owed a duty to the plaintiffs and can be held strictly liable for the damages sustained by the plaintiffs. Further, if there was evidence the Parish knew or should have known about the dangerous condition of Sullivan Road and failed to take corrective action within a reasonable time, the Parish was not only strictly liable for the accident in question, but also negligent in failing to follow up with the necessary repairs and maintenance of Sullivan Road.
The unreasonable risk of harm criterion requires a balancing of the likelihood and magnitude of harm against the utility of the thing, as well as a broad range of social, economic, and moral factors, including the cost to the defendant of avoiding the harm, and the risk and the social utility of the plaintiff's conduct at the time of the accident. All the circumstances surrounding the particular accident under review must be carefully considered to determine whether allowing recovery to the particular plaintiff involved, for damages occurring in the particular manner in which the plaintiff was injured, is desirable from the standpoint of justice and the social utility of the conduct of the respective parties. Greenlee v. State, Department of Transportation and Development, 98-2522, pp. 3-4 (La. App. 1 Cir. 2/18/00), 753 So.2d 364, 366.
With regard to causation, the Louisiana courts have applied the "substantial factor" test to determine causation in cases where there may be several causes-in-fact for a single accident. Graves v. Page, 96-2201, p. 8 (La.11/7/97), 703 So.2d 566, 570. As noted by the supreme court in the landmark decision of Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 482, 137 So.2d 298, 302 (1962), "[n]egligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm.... [T]he negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it."
There were several witnesses and considerable documentary evidence presented to the jury regarding the defective condition of Sullivan Road, particularly in the area of the Sparkle Drive curve, and causation. Prior to the beginning of testimony, *691 the Parish entered into a stipulation concerning the feasibility of improving the condition of Sullivan Road. The Parish stipulated on the record that it was feasible to overlay Sullivan Road prior to May 10, 1993. In fact, the jury heard testimony that in late spring 1990, the taxpayers had approved a one-half cent sales and use tax to be dedicated to the rehabilitation of roads and streets in the Parish.
The first witness called on behalf of the plaintiffs was local resident Marilyn Mansur. Mrs. Mansur sent a letter on May 15, 1990 to State Representative Donald Ray Kennard, then City Councilman Doug Welborn, and Neil Wagoner, Secretary of DOTD, directing their attention to "the extremely dangerous condition of Sullivan Road." Mrs. Mansur's letter continued as follows: "When it rains, however lightly, the street becomes as slick as glass. There have been accidents too numerous to mention in both good and bad weather, but especially in bad weather." Mrs. Mansur indicated that she had been involved in an accident in 1988 on Sullivan Road and had finally moved from the area in 1992 because she feared for the safety of her family and herself while traveling down what she called "homicide alley."
Mrs. Mansur's letter provoked a reply from Gordon Nelson, the District Maintenance Engineer for DOTD. In this June 26, 1990 letter, Mr. Nelson advised Mrs. Mansur he was requesting that DOTD's research office perform a skid study on the section of Sullivan Road in question. Further, unbeknownst to Mrs. Mansur, her complaint regarding Sullivan Road had been forwarded by Mr. Welborn to the Parish's Citizen's Service Office and registered as a "Citizen's Service Complaint." A status sheet from the Citizen's Service Office dated July 10, 1990, contained the following language: "COMPLAINT: ON SULLIVAN RD, BETWEEN GREENWELL SPRINGS AND HOOPER RD, THE ROAD SURFACE IS VERY SLICK AND POTENTIALLY A ROAD HAZARD. PLEASE INSPECT TO SEE WHAT CAN BE DONE."
On the same date that this status sheet was generated, July 10, 1990, Timothy Cummings, a traffic engineer with the Parish at the time in question, received Mrs. Mansur's Citizen's Service Complaint form. Ironically, by the time he received Mrs. Mansur's complaint, Mr. Cummings was already aware of an accident at the same location where the accident in this instant case occurred. In a City-Parish Departmental Memorandum dated April 16, 1990, Jo Samford, Small Claims Adjuster, requested that Jim Webb, Director of the Department of Public Works, have an engineer check the road conditions in the 8200 block of Sullivan Road. Ms. Samford's memorandum continued as follows:
An accident was reported to us in which the claimant was headed south on Sullivan, the car went into a spin and claimant hit a culvert at 8216 [S]ullivan. Claimant alleges the road is defective at this point.
Please give us a full report and advise if you know of previous accident[s] at this location.
During his trial testimony, Mr. Cummings acknowledged that not only was the location the same for both accidents, i.e., the Sparkle Drive curve, but that the vehicles were both traveling in a southerly direction.
About one month after receiving Mrs. Mansur's complaint, Mr. Cummings sent a letter to Steve Cumbaa, Management Systems Research Administrator for the Louisiana Transportation Research Center, regarding the condition of Sullivan Road. In a letter dated August 31, 1990, Mr. Cummings requested that a skid test be conducted on Sullivan Road from Hooper *692 Road to Greenwell Springs Road. A copy of this letter was also sent to Robert Canfield, Acting Director of Public Works, and Tom Buckely, Traffic Operations Engineer with DOTD.
Skid resistance testing was conducted on October 3, 1990, as requested by Mr. Cummings. In an October 4, 1990 letter to Mr. Cummings, Mr. Cumbaa stated, "The skid test results for this roadway are in a range that are generally considered low and there is a need for surface texture improvement." Mr. Cumbaa had indicated to Mr. Cummings that any skid number below 34 should be addressed. According to the test results for Sullivan Road, the skid numbers for the Sparkle Drive curve were 27.6 for the northbound lane and 26.8 for the southbound lane. Mr. Cummings acknowledged that at the time of the accident in question, Sullivan Road would have been even slicker than is shown on the October 1990 skid test due to the high number of vehicles (approximately 11,000) that travel Sullivan Road on a daily basis.
After receiving the skid test results from Mr. Cumbaa, Mr. Cummings immediately addressed the need for additional signage on Sullivan Road. There were already two "Slippery When Wet" signs in place on either side of the curve near Sparkle Drive. Mr. Cummings had an additional "Speed Limit 45" sign installed near the curve in question. Further, Mr. Cummings had two more "Slippery When Wet" signs installed in other areas on Sullivan Road. Mr. Cummings noted that "Mr. Cumbaa's test results showed that not only was the area of the curves slippery, but he had low side numbers throughout the entire section." However, even assuming that the placement of signs could be construed as sufficient warning or adequate discharge of the Parish's duty to motorists; according to Mr. Cummings, when he visited the scene of the accident on May 18, 1993, there were no "Slippery When Wet" signs for the southbound traffic, the direction in which the Buhler vehicle was traveling. Further, Mr. Cummings indicated that an accident study for the entire length of Sullivan Road was conducted, revealing that from October 1, 1989, through September 30, 1990, there were 136 accidents on Sullivan Road, 52 of which occurred in wet weather. Mr. Cummings received this information on November 20, 1990.
In a December 12, 1990 letter, Mr. Cummings notified Tom Buckley, his counterpart at DOTD, about the problems with Sullivan Road. He advised Mr. Buckley about the accident study that had been conducted on Sullivan Road and indicated that the Parish would be installing additional warning signs. According to Mr. Cummings, he wanted Mr. Buckley to be aware that there were problems with the entire length of Sullivan Road, some of which extended into the State-owned portion of the road. He wanted Mr. Buckley to address the "wet weather accident problem" on Sullivan Road between Wax Road and Hooper Road. Mr. Cummings included a copy of the skid test results and a copy of the accident diagram showing where the wet weather accidents had occurred. He also sent a copy of this December 12, 1990 letter to his boss, Robert Canfield.
When asked at trial about the unusually slippery condition of Sullivan Road, the following colloquy occurred between Mr. Cummings and counsel for plaintiffs:
Q All right, now, earlier in this trial the jury was told that roads are slipperier when they are wet, and you would agree with that, wouldn't you?
A Yes.
Q But the fact that there is rain on a roadway and it gets slippery doesn't necessarily mean that it's unusually slippery, right?

*693 A No.
Q But there are some roads which are unusually slippery, aren't there? Would you agree with me, abnormally slippery?
A Yes.
Q Below what they should be?
A Yes.
Q Slicker than they ought to be, correct?
A Yes.
Q And in those situations you have a road, even when it's dry, that's slicker than it ought to be, right?
A Yes.
Q And when it gets wet, it even gets slicker than that, correct?
A Yes.
Q Now, this road, Sullivan Road, Mr. Cummings, was one of those roads, wasn't it sir?
A Yes, according to this test.
Q Okay, and you have no reason to doubt this test?
A No, I requested it.
Q Correct, and you requested it from a man who knows how to do the test, correct?
A Yes.
Q And, in fact, you considered Mr. Cumbaa to be an expert in this, did you not, sir?
A Yes.
Q So when you got back this data, it confirmed that this was not just like [counsel for defense] was telling the jurors earlier, a regular old road when it gets rained on, it's a bit slippery because every road gets slippery. This was a road which was unusually and abnormally slippery, was it not?
A Yes.
Q And it needed to be corrected, didn't it, sir?
A Yes.
Q And it needed to be overlaid, didn't it?
A Yes.
. . . .
Q Let me make sure I understand your answer. Before May 10th of 1993, the day two young men were killed and two young men were seriously hurt, you believed it should be overlaid, and it was not overlaid. Isn't that true, Mr. Cummings?
A That's correct ....
Robert Canfield, who ultimately became Director of Public Works in 1992, testified that he received information from Mr. Cummings regarding the alleged problems on Sullivan Road. Mr. Canfield disagreed with Mr. Cummings' opinion that Sullivan Road was unusually and abnormally slippery and testified as follows: "In my opinion this road was not unusually slick. If you look at the skid numbers, they're low. They are not unusually low. They are possibly not any different than we would find on most of the other roads and that's why we were having like a third of the accidents and that's probably why most places have a third of the accidents during wet weather." When asked to explain why Ray Burgess, Program Manager for the Street/Road Rehabilitation Program for the Parish, was not advised about the complaints regarding Sullivan Road, Mr. Canfield explained that when there was an "unusual situation," it was his "obligation to bring it to the attention of anybody that is necessary." Mr. Canfield indicated that in his opinion, there was "nothing unusual about these conditions" and that "[t]here was no reason to do anything beyond what Mr. Cummings did, which was to install some slippery when wet signs on the road."
Ray Burgess testified that he became the Program Manager for the Street/Road *694 Rehabilitation Program for the Parish in May of 1990. Mr. Burgess acknowledged that there was a one-half cent sales and use tax that had been approved by the taxpayers for the exclusive use of rehabilitating roads and streets in the Parish. He added, "[t]here was never any question about the City-Parish having funds to rehabilitate roads." As Program Manager, Mr. Burgess was charged with inspecting the roads in the Parish and determining which roads were in need of repair. Mr. Burgess indicated that he, and the two engineers who worked directly for him, would make selections based on condition, volume of traffic, and location.
According to Mr. Burgess, he was never informed of any complaints concerning Sullivan Road prior to the accident in question. He indicated that in 1993, Sullivan Road was not on his project list because the Parish believed that there were "greater needs on other roads" and that Sullivan Road "could wait." Further, he stated that he visited the area in question within a week of the accident and found "no appreciable failures." Mr. Burgess testified that "the road was in as good or better condition than many others we have in like condition." He maintained that based on the condition of the road when he inspected following the accident, he would not have moved the road up on his schedule into the category of "must fix roads."
When asked what he would have done had he known about the complaints concerning Sullivan Road prior to the accident in question, the following exchange occurred between Mr. Burgess and counsel for plaintiffs:
A I can tell you what I would probably have done. I would have probably set it up on a schedule for the next six months, but not on an emergency basis like I did.
Q So the terrible accident is what caused you to put it on an emergency basis?
A No question about it.
Q And had this accident happened a year before and had you known about it, you would have put it on the emergency if you had the money, you would have done it earlier, right?
A Well, you've got to understand that I'm human like everybody else, and I would have certainly reacted to something as tragic as that, and I would have takenI would have done anything in the world to try to correct it.
During re-cross examination by counsel for the plaintiffs, Mr. Burgess attempted to recant his testimony that he "probably" would have included Sullivan Road in the schedule for the next six months, but still conceded that he "would have given it serious consideration." The fact remains that despite the letters, file memos, and correspondence noted above, because Mr. Burgess was not advised of the serious complaints and concerns about Sullivan Road, he was unable to make an informed decision as to whether to prioritize improvements for Sullivan Road, improvements that clearly could have prevented this accident, or at the very least, lessened the tragic outcome.
According to the record, within about one month of the accident, Sullivan Road was rehabilitated by the Parish. Mr. Burgess was asked why the improvements were done in 1993. He responded as follows:
Well, I wouldI think I would be a fool to say that the accident had something to do with it because everybody knows that. We went out immediately. We surveyed the road. Wewe rode the curves, and we decided that we would improve or increase the super elevation on the curve in question. The *695 super elevation, of course, we raised the outside so that it would have a bigger slope so that the centrifugal force of a vehicle going around the curve would [be] less likely [to] fly over into the air than it would be to stick to the road. We looked at the condition of the [surface], but primarily we went in and did a minimal amount of patching on the road itself. We improved the super elevation of the outside of the curve. We improved the inside of the curve. We widened it out, and we overlaid it with two inches of asphalt and concrete, and then we improved the shoulders with either stone or broken concrete. I've forgotten which. We did it out of a white material so it would accentuate thethe road itself.
City Councilman Doug Welborn also testified about the steps he took in trying to address the complaints concerning Sullivan Road. Mr. Welborn served as a city councilman for 11 years representing District Four, an area that included Sullivan Road. Mr. Welborn left the City Council in November of 1991 when he became Clerk of Court for East Baton Rouge Parish. While serving as a city councilman, Mr. Welborn had occasion to drive on Sullivan Road in wet weather. According to Mr. Welborn, Sullivan Road was an abnormally slippery and slick road. Mr. Welborn testified that for years, the Sparkle Drive curve had been referred to as "dead man's curve." He indicated that it was common knowledge that fire trucks routinely slid off the roadway during non-emergency situations and that the Sheriffs office received numerous calls regarding vehicles sliding off the roadway for no apparent reason. When asked his opinion of Sullivan Road where this accident occurred, Mr. Welborn stated as follows: "My opinion was that I had grave concern that it was extremely dangerous. I had firsthand knowledge that it was slick; that it was slippery when it was wet; that it was going to continue until the road was fixed. That's it."
When Mr. Welborn initially received Mrs. Mansur's complaint, he followed normal procedure and directed it to the Citizen's Service Office. As previously indicated, Mrs. Mansur's complaint was lodged with the Citizen's Service Office on July 10, 1990. After not hearing anything from the Department of Public Works regarding the problems with Sullivan Road, Mr. Welborn sent what he titled an "EMERGENCY REQUEST" to the Citizen's Service Director on November 6, 1990. Mr. Welborn requested a "FULL INVESTIGATION ON AN EMERGENCY PRIORITY" of the problems on Sullivan Road. Mr. Welborn further stated, "THERE HAVE BEEN MANY ACCIDENTS IN WET/INCLIMATE [sic] WEATHER. THE E.B.R. SHERIFF'S OFFICE AND CENTRAL FIRE DEP'T. HAVE ALSO ACKNOWLEDGED THAT THE SURFACE IS VERY SLIPPERY AND IT IS EXTREMELY DANGEROUS WHEN WET." According to Mr. Welborn, this request was sent not only to the Citizen's Service Director, but also to the Department of Public Works. On that same date, Mr. Welborn sent a handwritten note to Mrs. Mansur advising her that he had requested an investigation into the problems with Sullivan Road. He further indicated that he was awaiting the skid test results and referenced Bob Canfield, Director of the Department of Public Works, as the contact person if results were not received timely. Mr. Welborn testified that when he left office in November of 1991, he was unaware that any investigation or work had been done to address the problems on Sullivan Road.
Dennis Lewis, owner and operator of Lewis Wrecker Service, testified he had received numerous calls concerning accidents *696 on Sullivan Road, particularly in the curve near Sparkle Drive, where this accident occurred. Mr. Lewis indicated that before the guardrail in the curve was installed, he was called out to this location two or three times a week and that the calls increased when it was raining.
Representative Donald Ray Kennard testified that he lives on Sullivan Road about one-and-a-half miles from the location of this accident. He indicated that prior to the date of this accident, he drove on Sullivan Road daily and was in the area where the accident occurred about 15 to 20 times a week. When asked about the conditions on Sullivan Road near where the accident occurred, Representative Kennard stated:
Well, whenever it rains, the road becomes very slippery. Itit becomes very dangerous. In my opinion it becomes very treacherous. When you're going south especially on Sullivan Road, youyou need to be very careful when the road isis wet, and even in dry conditions it's still an area that I respect very much. When I'm driving Sullivan Road, I'm very cognizant ofof that particular area of the road.
Representative Kennard added further that in his 22 years with the legislature, he had received approximately 75 to 100 phone calls about all areas of Sullivan Road.
The testimony of Mr. Welborn, Mr. Lewis, and Representative Kennard was further supported by the testimony of Terry Summers, a local resident who lived about 400 yards from the Sparkle Drive curve. According to Mr. Summers, he had lived on Sullivan Road for the past 43 years and was very familiar with the area in question. He testified that accidents in that curve were a "weekly occurrence" and that Sullivan Road was a "very slippery highway particularly so in that curve."
George Ellis, the only plaintiff with any memory of the accident, testified about the events precipitating the actual collision. According to Mr. Ellis, it had been raining on the day of the accident, and the roadway was wet. He was on his way home from work and was headed northbound on Sullivan Road. Mr. Ellis gave the following account of how the accident happened:
I noticed the Buhler's Toyota truck coming around the curve. At the time I didn't know it was Buhler's, butand they appeared to be out of control. I noticed that they eitherI don't know if they did a complete spin or if they were just fishtailing. It just looked like they were coming out of a spin, and as they were coming towards me after that point when theythey appeared to have straightened out. I thought everything was fine. I thought they were just going straight down the road, and they had straightened back out, but then within, my guess, 25 or 30 feet of me, all of a sudden they hit the guardrail, and it just instantly slung them in front of me, and thatyou know, that was the wreck. That's what happened.
Mr. Ellis further indicated that he was driving between 40 and 45 miles per hour at the time of the accident and that the Buhler vehicle was "going give or take the same speed."
John Thomas Bates was called on behalf of the plaintiffs. Mr. Bates was accepted by the court as an expert in the field of accident reconstruction and highway design. Mr. Bates testified that based on all of the evidence he reviewed, Sullivan Road was unreasonably dangerous. He further added that the dangerous condition of the roadway, i.e., the fact that it was unreasonably slippery, played a contributing role in the accident in this case. When asked what led to his conclusion that the road *697 was dangerous, Mr. Bates stated as follows:
First of all, the skid tests that were performed by the State DOTD in 1990 considerably before the accident occurred; the second thing is that these skid numbers reflected a very slippery condition; that is 95 percent of all of the tests that were made by the State failed that 34 skid number that the State said if it's below that, it's slippery. Next is that a traffic engineer should be able to look at those numbers and raise a red flag because those numbers are significantly below nationally published, widely recognized authorities on what level of slickness or coefficient of friction that there should be on roads of this sort, and next I believe that the City-Parish knew for some two and a half, three years prior to this accident of this condition, and yet did nothing more than if you have a major artery in your arm that is cut and spewing blood. You don't put a band-aid on it to stop the blood from flowing, and yet all that they did was put band-aids instead of solving the problem.
Mr. Bates noted that the Parish could have fixed the problems on Sullivan Road by overlaying the old slick asphalt with new asphalt, thus producing higher coefficients of friction. He further added that short of overlaying the road, the Parish could have done what is called a "seal and chip surfacing." Mr. Bates described this as "an acceptable method of improving a slippery pavement" that is "a lot cheaper than asphalt overlay."
Dr. Olin K. Dart, Jr. testified on behalf of the Parish as an expert in the field of highway design, accident reconstruction, and traffic safety. When asked his opinion about the minimum acceptable skid number, Dr. Dart avoided directly answering the question. Rather, he stated that it would be desirable to keep road surfaces at a skid number of 35 or higher. Dr. Dart further acknowledged that in the past, he had opined that the minimum acceptable skid number was 35, well above the skid numbers for the area on Sullivan Road where this accident occurred. According to Dr. Dart, he agreed with Mr. Cummings and Mr. Cumbaa that Sullivan Road needed to be overlaid in late 1990. When asked if the low skid numbers on Sullivan Road had anything to do with the accident, Dr. Dart replied, "Well, again the amount of friction there will, of course, control what happens with the vehicle, and I'm not sure how thatbut if you get the right combination of speed and friction, then you can have a loss of control."
Based on our thorough review of the record, we conclude that the evidence overwhelmingly establishes and supports a finding that the defective condition of Sullivan Road created an unreasonable risk of harm to the plaintiffs and was a substantial factor in bringing about the accident. Further, the evidence is overwhelmingly in favor of a finding that the Parish knew of the defective condition of the roadway and failed to address same. Thus, the trial court was correct in granting a JNOV on the liability issue as it pertains to the condition of the roadway. No reasonable jury could have found to the contrary.

ALLOCATION OF FAULT
Having determined that the trial court was correct in granting a JNOV, we must now review the JNOV under the manifest error standard of review. See Martin, XXXX-XXXX at 6, n.7, 784 So.2d 627, 632, n. 7. A review of the trial court's November 8, 1999 judgment reveals that the trial court found the law and evidence to be in favor of the plaintiffs and against the Parish. The court then awarded damages to the plaintiffs based on their respective *698 injuries and losses. However, the judgment was silent as to allocation of fault.[8]
It is well settled that the allocation of fault is a factual matter within the sound discretion of the trier of fact and will not be disturbed on appeal in the absence of manifest error. Birdsall v. Regional Electric & Construction, Inc., 97-0712, p. 4 (La.App. 1 Cir. 4/8/98), 710 So.2d 1164, 1168. If an appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but then only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the trial court's discretion. Clement v. Frey, 95-1119, 95-1163, pp. 7-8 (La.1/16/96), 666 So.2d 607, 611. However, when there is evidence before the trial court that, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, the appellate court should not disturb this finding absent manifest error. Daigle v. Legendre, 619 So.2d 836, 840-41 (La.App. 1 Cir.), writ denied, 625 So.2d 1040 (La.1993).
In determining the percentages of fault, the trial court must consider the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. The factors to be considered include (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances that might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985).
An individual driver owes a duty of being reasonably observant of conditions that might affect the operation or use of his vehicle that would pose an unreasonable risk of harm to others. This duty includes the duty to use his automobile reasonably and to maintain a proper lookout for hazards which might pose an unreasonable risk of harm. Faulkner v. State, Department of Transportation & Development, 25,857, 25,858, p. 10 (La. App. 2 Cir. 10/26/94), 645 So.2d 268, 275-76, writs denied, 94-2901, 94-2908 (La.1/27/95), 649 So.2d 390.
With regard to the speed of the Buhler vehicle, George Ellis, the only eyewitness to the accident, testified that Matthew was only going about 40 or 45 miles per hour at the time of the accident. The posted speed limit at the accident site was 45 miles per hour. Further corroborating Mr. Ellis' testimony, Terry Summers stated that he had seen the Buhler vehicle in a group of five or six vehicles traveling on Sullivan Road just prior to the accident. According to Mr. Summers, none of the vehicles in the group, including the Buhler vehicle, appeared to be speeding. While there was no direct evidence that Matthew was speeding at the time of the accident, there was sufficient evidence that he failed to maintain control of his vehicle given the conditions present. It is undisputed that it had been raining the day of the accident and that the roads were wet. Further, there was overwhelming evidence that Sullivan Road was an unusually slippery road, especially when wet.
*699 Matthew's parents testified about Matthew's familiarity with Sullivan Road. The Buhlers live on Greenwell Springs Road about 200 yards from Sullivan Road. According to his parents, Matthew drove on Sullivan Road daily to and from school. At the time of the accident, Matthew and his friends, Jason Adams and Jason Le-Blanc, were returning from school in Matthew's truck, a 1984 Toyota truck that his parents had purchased for him in December 1992. Matthew was in his junior year of high school at the time. Although he had only had his truck for a short while before this accident, Matthew had been driving to and from school via Sullivan Road in one of the other Buhler family vehicles since the beginning of his junior year. Jason Adams testified that Matthew routinely picked him up at his house on Sullivan Road and drove him to school. Further, according to Lacy LeBlanc, her son Jason would occasionally ride to and from school with Matthew and Jason Adams.
Robert Canfield testified that he had driven on Sullivan Road in both dry and wet weather and did not have any problems with it. When asked if he found the road to be unusually slippery, Mr. Canfield stated: "Not anymore than most of the roads that we have. If you didn't slow down below the posted speed limit during wet weather on any of our roads it would be a problem."
Dr. Ned Efrom Walton testified on behalf of the Parish as an expert in the fields of highway design and safety, accident reconstruction, and human factors engineering. Dr. Walton acknowledged that he did not know how fast the Buhler vehicle was traveling at the time of the accident. However, when asked his opinion as to how the accident occurred, Dr. Walton responded, "I think it was simply driving the vehicle at a speed that was not consistent with the wet weather conditions out there that day." Similarly, Dr. Dart opined that "the vehicle was going too fast for the conditions." Dr. Dart added further: "It's my opinion that this vehicle went out of control because it was exceeding thea safe, prudent speed in approaching this curve and then lost control due to the fishtailing and the rear end coming around and going into a spin." Dr. Dart indicated that he had examined Matthew's truck after the accident and described it as a four-wheel drive truck with two seats and a "jacked up chassis." Dr. Dart noted that the truck was set up for off-the-road activity and had a high center of gravity. Dr. Dart further testified that pickup trucks in general have a tendency to fishtail in the right set of conditions because they are "light in the rear end."
In the instant case, the trial court found Matthew to be free from fault and assigned 100 percent of the fault to the Parish. Considering the above evidence, it is abundantly clear that at the very least, Matthew breached his duty of being reasonably observant of the conditions of the roadway on the day of the accident. Matthew regularly traveled Sullivan Road and should have been more aware of the risks associated with driving on this roadway, at or near the maximum authorized speed limit, in wet weather conditions, in a vehicle with a high center of gravity and a general tendency to fishtail. Thus, we conclude that the trial court's finding that Matthew was not at fault is clearly wrong. The lowest amount of fault that a reasonable fact finder could have assessed to Matthew was 20 percent. Accordingly, we amend the trial court's judgment and assess the following percentages of fault: 80 percent to the Parish and 20 percent to Matthew Buhler.

DAMAGES
Once a trial court has granted a JNOV on the issues of damages and has *700 conducted its own independent assessment of the damages as trier of fact, that decision becomes the judgment of the trial court and is reviewed on appeal for an abuse of discretion under the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).[9]Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 833-834 (La.1991). See also Thibodeaux v. Wal-Mart Stores, Inc., 98-0556, p. 2 (La.App. 1 Cir. 4/1/99), 729 So.2d 769, 770-71, writ denied, 99-1244 (La.6/18/99), 745 So.2d 28.
It is well settled that the trier of fact has much discretion in awarding damages. La. Civ.Code art. 2324.1. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The appellate court's first inquiry should be "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Youn, 623 So.2d at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn, 623 So.2d at 1261.
According to the extensive medical evidence in the record, Jason Adams sustained very serious injuries in the May 10, 1993 accident. Jason, who was 16 years old at the time of the accident, sustained an injury to his heart resulting in a tricuspid valve insufficiency. Jason underwent open-heart surgery to repair the torn valve. According to the cardiovascular surgeon who treated Jason, Jason will likely need a valve replacement in the future because the valve continues to leak. In addition to the heart injury, Jason suffered a frontal lobe injury to the right side of his brain that has left him with permanent brain damage. Jason also sustained a compound fracture of his left tibia and left fibula, a severe crushing injury to his right ankle, a fractured pelvis, and a fractured finger on his right hand. He underwent several surgeries to repair these injuries, one of which included the insertion of a rod into his left leg to maintain fixation of the compound fracture. The orthopedic surgeon who treated Jason testified that Jason has a combined impairment to both lower extremities of about 42 percent and a total body disability rating of 17 percent. He added further that Jason would be restricted to light to medium work.
Jason's parents testified as to how the accident had affected their lives. Thomas Adams indicated that prior to the accident, Jason enjoyed sports, fishing, and hunting. He described Jason as easygoing and determined. Similarly, Nancy Adams testified that Jason was very loving, caring, and family oriented before the accident. Following the accident, Thomas, Nancy, and Matthew's two siblings remained at the hospital 24 hours a day while Jason was in a coma. When Jason went home from the hospital, his family had to take *701 care of him. Jason was in a lot of pain and was confused about what had happened to him. Nancy indicated that for the first couple of months, she had to bathe him, feed him, and change him. Nancy stated that because she is Jason's primary care-giver, he tends to direct his anger and frustrations towards her, fighting with her and rebelling against her.
With regard to George Ellis, while his injuries were not as extensive as Jason's, he and his wife Ronda testified about the impact the accident had on them. George sustained multiple rib fractures, a collapsed lung, a torn bicep muscle in his right arm, and a fractured sternum. He remained in the hospital for three days following the accident, and as late as July 1996, he was still suffering from musculoskeletal pain and headaches. George's family physician indicated it was likely that George would continue to have these problems for the remainder of his life. Following the accident, George was also having some psychological problems and problems sleeping, all of which were related to the accident. Ronda testified that following the accident, she stayed home from work for one week to care for George. She stated that since the accident, George is easily frustrated and does not have any patience with himself. Ronda agreed that George was still having problems sleeping and added that it was not until approximately July of 1996 that she and George were able to resume regular sexual relations.
The evidence in the record concerning the losses sustained by the LeBlanc and Buhler families clearly indicated very loving and emotionally close family relationships. Jason LeBlanc, who was 18 years old at the time of his death, was described as the center of his family. Jason started helping his father in the family's plumbing business at the age of 9. Jason was the oldest of three children and loved his brother and sister very much. Jason's father, Randy LeBlanc, testified that Jason loved to fish and that he and Jason had probably fished every pond in the parish. According to Randy, Jason was everything to him. Jason's mother added that their family was not complete without Jason.
Matthew Buhler was 17 years old at the time of this tragic accident. His parents arrived on the scene of the accident only to learn of their son's death. Matthew's parents described him as a very happy child who loved the outdoors and loved to hunt. Matthew and his father participated in archery competitions together. Matthew had an older sister who was 10 years old when he was born. According to Matthew's mother, her daughter was like a second mother to Matthew. About six months after the accident, Matthew's parents moved from their house because there were too many memories of him there.
Based on our review of the evidence contained in the record, we find no abuse of discretion by the trial court in the damages awarded. Given the "particular injuries and their effects under the particular circumstances" on the plaintiffs, the trial court's damage awards are not beyond that which a reasonable trier of fact could assess. See Youn, 623 So.2d at 1260. However, based on our reallocation of fault, the damages awarded to each of the plaintiffs will be reduced by 20 percent. Thus, the damage awards are amended as follows:

Randall K. LeBlanc $ 280,000.00 (general damages)
Lacy W. LeBlanc $ 280,000.00 (general damages)
Randall K. and Lacy W. LeBlanc $ 4,328.00 (special damages)

*702
Charles L. Buhler $ 280,000.00 (general damages)
Linda F. Buhler $ 280,000.00 (general damages)
Charles L. and Linda F. Buhler $ 5,088.00 (special damages)
George R. Ellis $ 220,000.00 (general damages)
George R. Ellis $ 34,231.00 (special damages)
Ronda J. Ellis $ 16,000.00 (general damages)
Jason Adams $1,000,000.00 (general damages)
Jason Adams $ 482,757.00 (special damages)
Nancy Adams $ 80,000.00 (general damages)
Thomas Adams $ 60,000.00 (general damages)

NEW TRIAL
As previously indicated, a motion for a JNOV may be joined with an alternative motion for a new trial. La. Code Civ. P. art. 1811(A)(2). If a JNOV is granted, the trial court must also rule on the motion for a new trial in the event that the JNOV is thereafter vacated or reversed. La. Code Civ. P. art. 1811(C).
Pursuant to La.Code Civ. P. art. 1972, the peremptory grounds for a new trial are as follows: (1) when the verdict or judgment appears clearly contrary to the law and evidence; (2) when the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial; and (3) when the jury was bribed or has behaved improperly so that impartial justice has not been done. Moreover, La.Code Civ. P. art. 1973 provides the trial court with discretionary authority to grant a new trial "in any case if there is good ground therefor, except as otherwise provided by law."
Recently, in Davis v. Wal-Mart Stores, Inc., XXXX-XXXX (La.11/28/00), 774 So.2d 84, the Louisiana Supreme Court discussed the trial court's discretionary authority in ruling on a motion for a new trial. The court concluded as follows:
The motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Whether to grant a new trial requires a discretionary balancing of many factors. Unlike the standard applicable to a motion for JNOV, the trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. Perhaps the significant authority is the ability to assess the credibility of witnesses when determining whether to grant or deny the motion for a new trial. The trial court's discretion in ruling on a motion for new trial is great, and its decision will not be disturbed on appeal absent an abuse of that discretion. Furthermore, this court has held that "when the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered."
Although the granting or denying of a motion for new trial rests within the wide discretion of the trial court, the discretion of the court is limited:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and *703 the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.

Davis, XXXX-XXXX at 10, 774 So.2d at 93 (citations omitted).[10]
In the instant case, the trial court conditionally granted a new trial, finding the verdict contrary to the law and the evidence. We have closely reviewed the record to determine whether the jury's original verdict was supportable by any fair interpretation of the evidence. As previously indicated, the evidence presented to the jury was overwhelmingly in favor of a finding of liability on the part of the Parish for its failure to address the problems with the condition of Sullivan Road. The jury's verdict, in finding no liability on the part of the Parish, was clearly not supportable by any fair interpretation of the evidence presented at trial. Thus, we find no abuse of discretion by the trial court in conditionally granting a new trial in this matter.

THE LEBLANC DAMAGE AWARD
In answering the appeal by the Parish, the LeBlancs urge this court to increase their damage awards to an amount that "will fully, completely and adequately compensate them for the loss of their son." They further allege that their "damage awards were inadequate to compensate them for the death of their minor son, Jason LeBlanc, considering the close relationship they had with him and the close familial ties they had prior to his death."
This court deeply sympathizes with the LeBlancs and the other plaintiffs in this case over their losses following this very tragic accident. However, as previously indicated, we find no abuse of discretion by the trial court in its damage awards. Thus, an increase in damages to the LeBlancs is not warranted.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court granting a JNOV and conditionally granting a new trial in favor of the plaintiffs is amended as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Randall K. LeBlanc, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Two Hundred Eighty Thousand and No/100 ($280,000.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Lacy W. LeBlanc, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Two Hundred Eighty Thousand and No/100 ($280,000.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiffs, Randall K. LeBlanc and Lacy W. LeBlanc, and against defendant, City of *704 Baton Rouge/Parish of East Baton Rouge, in the sum of Four Thousand Three Hundred Twenty-Eight and No/100 ($4,328.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Charles L. Buhler, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Two Hundred Eighty Thousand and No/100 ($280,000.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Linda F. Buhler, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Two Hundred Eighty Thousand and No/100 ($280,000.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiffs, Charles L. Buhler and Linda F. Buhler, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Five Thousand Eighty-Eight and No/100 ($5,088.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, George R. Ellis, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Two Hundred Fifty-Four Thousand Two Hundred Thirty-One and No/100 ($254,231.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Ronda J. Ellis, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Sixteen Thousand and No/100 ($16,000.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Jason Adams, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of One Million Four Hundred Eighty-Two Thousand Seven Hundred Fifty-Seven and No/100 ($1,482,757.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Nancy Adams, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Eighty Thousand and No/100 ($80,000.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Thomas Adams, and against defendant, City of Baton Rouge/Parish of East Baton Rouge, in the sum of Sixty Thousand and No/100 ($60,000.00) Dollars, together with legal interest thereon from date of judicial demand until paid.
In all other respects, the trial court's judgment is affirmed. Costs in the amount of $19,220.90 are assessed against defendant-appellant, Parish of East Baton Rouge.
*705 AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] There is some discrepancy in the record as to how the Parish is identified. The trial court's judgment names the "City of Baton Rouge/Parish of East Baton Rouge" as defendants, and the jury verdict form refers to the "City/Parish." Yet, all of the pleadings in the records reveal that the Parish, not the City of Baton Rouge, was named as defendant in these consolidated matters. Because this discrepancy was not raised by any of the parties on appeal, further discussion of same is not warranted. Moreover, we take judicial notice that Baton Rouge has a consolidated form of government and is commonly referred to as "City of Baton Rouge/Parish of East Baton Rouge."
[2] Pursuant to a motion and order for voluntary dismissal dated November 29, 1995, all plaintiffs dismissed their claims against DOTD with prejudice.
[3] We note that State Farm, as liability and uninsured motorist (UM) insurer of the Adamses, filed a petition of intervention, alleging that it was subrogated to its insureds' rights against the Parish and DOTD. In its petition, State Farm alleged that it paid to, or on behalf of, the Adamses payments of $50,000.00 under its UM provisions and $5,000.00 under its medical payments provisions. Although we are unable to discern from the record what happened to State Farm's intervention, it is not at issue in this appeal.
[4] By order dated January 9, 1995, all of the claims asserted by the Ellises against Buhler and State Farm were dismissed with prejudice.
[5] We recognize that La. R.S. 9:2800 requires actual or constructive notice of the defect as a prerequisite to claims against public entities such as the Parish for damages caused by the condition of things within its care and custody. Thus, in order to prove public entity liability for a thing, the plaintiff must establish: (1) custody or ownership of the defective thing by the public entity; (2) that the defect created an unreasonable risk of harm; (3) that the public entity had actual or constructive notice of the defect; (4) that the public entity failed to take corrective action within a reasonable time; and (5) causation. We take judicial notice, however, that in Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14, the Louisiana Supreme Court held that La. R.S. 9:2800 was a substantive change in the law because it altered the government's duty under La. Civ.Code art. 2317. The constitutionality of this statute was called into question as an abrogation of sovereign immunity contained in La. Const. art. XII, § 10(A). Effective November 23, 1995, that constitutional provision was amended to allow the Legislature to limit the liability of public entities, including the circumstances giving rise to liability. Effective that same date, La. R.S. 9:2800 was reenacted by 1995 La. Acts No. 828. In Jacobs, the supreme court concluded that prior to November 23, 1995, the effective date of the amendment, the statute was an impermissible legislative act in direct conflict with Article XII, § 10(A)'s unequivocal waiver of sovereign immunity and was unconstitutional. Further, the court noted that because reenactment of La. R.S. 9:2800 was a substantive change in the law, it could not be applied retroactively. Jacobs, 98-2510 at 12, 737 So.2d at 23.
[6] Strict liability has been effectively eliminated by the enactment of La. Civ.Code art. 2317.1, which provides for liability only with knowledge or constructive knowledge on the part of the landowner. Article 2317.1, which became effective April 16, 1996, substantively changed the strict liability laws and does not apply retroactively. Thus, the earlier strict liability law still applies to claims that arose before the effective date of the 1996 legislation.
[7] Concerning the issue of the guardrail, we do not find that the evidence so strongly and overwhelmingly pointed to only one verdict, or that the jury verdict on this issue was so unreasonable that reasonable minds could have only reached one conclusion. Thus, a JNOV as to this issue was improper. However, because we have found that a JNOV was warranted on the liability issue as it pertains to the condition of the roadway, the issue of the guardrail becomes moot.
[8] In the jury's original verdict, 100 percent of the fault for the accident was assigned to Matthew Buhler. While we disagree with the percentage of fault assigned to Matthew by the jury, we do agree that there is sufficient evidence in the record to support a finding that Matthew bears some responsibility for this accident.
[9] In Coco, the Louisiana Supreme Court held as follows: "Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court." Coco, 341 So.2d at 335.
[10] In Martin v. Heritage Manor South, XXXX-XXXX, pp. 3-6 (La.4/3/01), 784 So.2d 627, 630-632, the Louisiana Supreme Court cited, with approval, its earlier decision in Davis and reiterated the applicable standard of review in ruling on a motion for new trial.