551 So.2d 644 (1989)
Gerald H. SANDERS, Jr. and Gene Ellen Sanders
v.
Jody T. COLLINS, Allstate Insurance Company and State Farm Mutual Automobile Insurance Company.
No. CA 88 0757.
Court of Appeal of Louisiana, First Circuit.
September 22, 1989.
Rehearing Denied November 7, 1989.
Writ Denied January 19, 1990.
*646 C. John Naquin, Jr., Baton Rouge, Michael P. Pellegrin, Houma, for plaintiffs and appellants Gerald H. Sanders, Jr. and Gene Ellen Sanders.
Stephen M. LaRussa, Houma, Ray Collins, Houma, for appellees and defendants Allstate Ins. Co. and Jody T. Collins.
Jerry H. Schwab, Houma, for appellees and defendants State Farm Mut. Auto. Ins. Co.
Before CARTER, LANIER and LEBLANC, JJ.
LEBLANC, J.
This appeal involves a suit for injuries sustained in an automobile accident. On December 19, 1985, plaintiff, Gerald H. Sanders, Jr., was driving his father's van. He was stopped at a red traffic signal when a vehicle driven by defendant, Mrs. Jody T. Collins, collided into the rear of the van. Mr. Sanders filed this suit against Collins claiming that he sustained severe injury to his neck, back and shoulders as a result of this accident. Mr. Sanders' wife, Gene Ellen Sanders, also claimed damages for loss of consortium. Also named as defendants were Allstate Insurance Company (Allstate), in its capacity as Collins' liability insurer and the uninsured/underinsured motorist insurer of plaintiff's father, Gerald Sanders, Sr., and State Farm Mutual Automobile Insurance Company, plaintiffs' uninsured/underinsured motorist insurer. Prior to trial, defendants admitted that the accident was caused by the sole negligence of Mrs. Collins. However, defendants claimed that no injuries or damages were caused by the accident.
The matter was tried before a jury. The jury determined that Mr. Sanders did suffer injury as a result of the accident of December 19, 1985, but that prior to the trial Mr. Sanders had fully and completely settled his claim with Allstate for injuries arising out of the December 19, 1985 accident. In accordance with these findings, the jury determined that Mr. Sanders was not entitled to any damages. The jury also found that Mrs. Sanders did not suffer any loss of consortium as a result of the accident. Subsequently, plaintiffs moved for a judgment notwithstanding the verdict and/or a new trial, contending that the jury abused its discretion in concluding that Mr. Sanders had settled his claim for injuries arising out of the December 19, 1985 accident.
The trial judge rendered a JNOV, finding that Mr. Sanders did not release his claim for medical expenses incurred after May 27, 1986, the date of the settlement and release. Accordingly, the trial court rendered judgment in plaintiffs' favor in the amount of $11,841.04. The trial judge summarized the following pertinent facts in his reasons for judgment:

. . . . .
The Plaintiff had been involved in two vehicular accidents. The first accident occurred on September 17, 1985; the second accident occurred on December 19, 1985. Plaintiff underwent surgery on January 23, 1986. On May 27, 1986, Plaintiff executed a release [with Allstate] wherein he received a sum of money, *647 the quantum of which was not made known to the jury. The jury obviously concluded that the Plaintiff had settled both accidents by the signing of this release.
Thereafter, the trial judge quoted the pertinent provision of the release which reads as follows:
... I do hereby release and forever discharge GERALD SANDERS SR, ALLSTATE INS CO and any other person, firm or corporation charged or chargeable with responsibility or liability, their heirs, representatives and assigns, from any and all claims, demands, damages, costs, expenses, loss of services, actions and causes of action, arising from any act or occurrence up to the present time and particularly on account of all personal injury, disability, property damage, loss or damages of any kind already sustained or that I may hereafter sustain in consequence of an accident that occurred on or about the 16th day of September 1985, at or near LA 1CutOff, LA....[1]
The trial judge then reasoned as follows:
The Court disagrees with the findings of fact that the release signed on May 27, 1986, by Plaintiff was intended to settle all claims for damages that were incurred before and after the signing of the release agreement, but will not disturb that finding, as it was within the purview of the finder of fact to make such a determination, and was one that could have been made by a rational trier of fact. The Court finds despite the jury verdict that the Plaintiff should be entitled to the medical expenses that he incurred after the signing of the release and as a result of the December 19, 1985 accident and for which he was not previously compensated.

. . . . .
From this judgment, plaintiffs appeals alleging the following assignments of error:
1) The jury erroneously concluded that the May 27, 1986 release executed by Mr. Sanders compromised Mr. Sanders' claims for the September 17, 1985 accident as well as the December 19, 1985 accident.
2) The trial court erred in granting judgment notwithstanding the verdict only for medical expenses incurred by Mr. Sanders after May 27, 1986, and in not awarding Mr. Sanders the full amount of damages sustained as a consequence of the December 19, 1985 accident.
3) The trial court erred in its refusal to grant a new trial.
Defendants, Jody Collins, Allstate and State Farm, answered this appeal seeking to have the trial court's judgment reversed and to have plaintiffs' suit dismissed with prejudice at plaintiffs' cost.
Our initial inquiry is whether the parties intended the release agreement to settle Mr. Sanders' claims arising from both of the accidents in which Mr. Sanders was involved, the September 1985 and December 1985 accidents; or only Mr. Sanders' claims arising from the September 1985 accident.
The release agreement in question is a transaction or compromise. La.Civ.Code art. 3071. The interpretation of this type of contract was addressed in Smith v. Leger, 439 So.2d 1203 (La.App. 1st Cir.1983):
A compromise agreement extends only to those matters which the parties expressly intend to settle. La.C.C.art. 3073; Matthew v. Melton Truck Lines, Inc., 310 So.2d 691 (La.App. 1st Cir.1975). Ordinarily, the meaning and intent of the parties to a written contract (such as a written compromise agreement) must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. La.C.C. art. 2276; Tauzin v. Claitor, 417 So.2d 1304 (La.App. 1st Cir.1982), writ denied, 422 So.2d 423 (La.1982). An exception to *648 this rule exists when there is a dispute between the parties as to exactly what matters were intended to be settled by the compromise agreement. La.C.C. art. 3079; Moak v. American Automobile Insurance Company, 242 La. 160, 134 So.2d 911 (1961); Munna v. Mangano, 404 So.2d 1008 (La.App. 4th Cir.1981). 439 So.2d at 1206
In the present case, Allstate contends that the parties intended to settle Mr. Sanders' claims arising from the December 1985 accident as well as the September 1985 accident because the release, which was executed on May 27, 1986, applies to all claims "... arising from any act or occurrence up to the present time ..." Plaintiffs take the position that the parties only intended to release claims arising from the September accident and that this intent is reflected by the specific reference in the release to the "... accident that occurred on or about the 16th day of September 1985, at or near LA 1CutOff, LA...."
Although the parties clearly disputed the matters that were intended to be settled by the release, the trial judge refused to admit parol evidence offered by Allstate regarding the intent of the parties at the time the release was executed. We find that the trial court committed prejudicial error when it refused to allow the introduction of this crucial evidence. Since the trial court excluded this testimony, the jury's finding that Mr. Sanders released his claims arising from the December 1985 accident is interdicted and must be set aside. We also reverse the trial court's judgment notwithstanding the verdict since it was based, in part, on the jury's interpretation of the release. However, since the parol evidence in question was proffered by Allstate, we are able to consider this evidence in rendering a de novo determination regarding the intent of the parties.
On proffer, Mr. Cody Oubre, a former claim representative for Allstate Insurance Company, testified that he negotiated the release agreement between Allstate and Mr. Sanders. Mr. Oubre stated that he was aware of both the September and December 1985 accidents. He further stated that the release agreement was intended only to settle the claims arising out of the September 17, 1985 accident. He explained that he and Mr. Sanders' attorney never discussed the December 1985 accident. He testified that he would have included a reference in the contract to the December 19, 1985 date and to Mrs. Jody Collins if the parties had intended to include the December accident in the release. He also stated that he was under the impression that Mr. Sanders' disc injuries resulted entirely from the September 1985 accident. Mr. Oubre's testimony also established that medical information and reports regarding Mr. Sanders' condition subsequent to each accident had been provided to Allstate prior to the execution of this release.
After examining the release agreement along with the proffered testimony of Mr. Oubre, we are compelled to find that the parties intended to settle only Mr. Sanders' claims for the September 1985 accident. Mr. Oubre's testimony regarding the intent of the parties is undisputed. Furthermore, the specific typewritten reference to the September accident, which was added by the parties to the printed language of the contract, evidences the parties' intent to settle only Mr. Sanders' claims arising from the September 1985 accident. See, Merrill Lynch Realty, Inc. v. Williams, 526 So.2d 380 (La.App. 4th Cir.1988).
Since we rule in plaintiffs' favor regarding the interpretation of the release agreement, we must next address the jury's finding that Mr. Sanders did sustain injury as a result of the December 1985 accident. This finding was not affected by the trial court's error in excluding the parol testimony. Therefore, there is no justification for disregarding the jury's finding that Mr. Sanders was injured by the December 1985 accident. The manifest error rule is therefore applicable to that portion of the jury's verdict. Picou v. Ferrara, 483 So.2d 915 (La.1986). After thorough review of the record in this case, we find no manifest error in this finding. However, the jury did not render a finding on the amount of damages caused by this accident. Since we *649 are presented with a complete record regarding Mr. Sanders' injuries, we are required to conduct an independent evaluation of the facts of this case and render a de novo judgment on the merits rather than remand this case to the trial court. Suhor v. Gusse, 388 So.2d 755 (La.1980).
The record establishes that Mr. Sanders was involved in a rear-end collision on September 17, 1985. Subsequently, plaintiff experienced pain in his neck, right arm, right leg and low back. One week after the accident, plaintiff was hospitalized by his family physician for traction therapy. While hospitalized, plaintiff underwent CT scan and myelogram testing that revealed multiple bulges of the discs in the cervical area. After a one week hospital stay, plaintiff was released from the hospital. Dr. Donald Judice, the neurosurgeon that diagnosed plaintiff's cervical condition, recommended conservative treatment for plaintiff, involving physical therapy and pain medication. Plaintiff's restrictions after the September 1985 accident included: avoid lifting over 50-60 pounds, do not sit or stand for prolonged periods, do not work with head in an unusual position and restrict driving to as little as possible.
Plaintiff testified that he returned to work in early November. He worked for his father and his previous work had consisted of repairing and delivering tools. After the September accident, plaintiff worked mainly on repairing tools. He explained that although he had some sporadic pains in his right arm and shoulder, he was able to work. If the equipment he worked on was heavy, he would have someone help him with the lifting. Plaintiff further testified that as of early December 1985, he was experiencing less pain and was better able to perform his work. He also explained that he had returned to other activities that he enjoyed such as fishing, cutting grass and working on automobiles.
During this time, however, plaintiff had continued to see his family physician on a regular basis complaining of sporadic pains in his right arm, right leg, right shoulder and neck. His family physician referred him to Dr. Judice who examined him on December 17, 1985. Dr. Judice attributed plaintiff's pain to plaintiff's disc injuries. Although conservative therapy had not resolved plaintiff's problems, Dr. Judice recommended continuing conservative therapy. Dr. Judice explained that he thought the normal healing process remained a viable alternative to disc surgery. However, Dr. Judice did discuss with plaintiff that an anterior cervical disc removal and fusion surgery might be necessary at some point in the future. No surgery was scheduled at this time. Dr. Judice suggested that plaintiff should postpone a decision regarding surgery a little longer to see if his condition would improve. Dr. Judice explained that if plaintiff's pain would have continued for 6-8 months and would have resulted in plaintiff not being able to work, he would have given plaintiff the choice to undergo surgery. Dr. Judice also stated that he did not advise surgery unless plaintiff developed a major neurological deficit or developed intractable pain.
Two days later, plaintiff was involved in another rear-end collision (the December 19, 1985 accident) which is the subject of this suit. Within twenty-four hours after this accident, plaintiff began to experience headaches, pain in his neck, left arm, left shoulder and numbness in his left arm. Plaintiff was examined in a hospital emergency room on the evening after the accident. He was sent home with pain medications. Plaintiff returned to Dr. Judice on January 7, 1986. Plaintiff complained that his neck and arm pain had worsened after the December accident and that he was experiencing pain in his left arm and shoulder which he had not experienced prior to the second accident. Plaintiff decided that he could no longer tolerate the pain he was experiencing and elected to have the cervical disc surgery that he had previously discussed with Dr. Judice.
Plaintiff was hospitalized and further tests were performed. CT scan and myelogram testing showed a one millimeter increase in the bulging cervical discs at two different levels. In Dr. Judice's opinion, the progression of the bulging discs was *650 attributable to the December accident. He also explained that plaintiff's increased symptoms of pain were related to the increase in the size of the bulges. Due to plaintiff's increased symptoms, on January 24, 1986, Dr. Judice performed the anterior cervical disc removal and fusion surgery on two cervical disc levels (C-4/C-5 and C-5/C-6). Dr. Judice explained that the same procedure was needed at a third disc level at that time, but that he did not perform the procedure because three-level fusions make the spine very unstable and lengthens the time of post-operative recovery.
Regarding plaintiff's need for the surgery, Dr. Judice explained that subsequent to the first accident, plaintiff would have probably needed surgery at some point in time but that plaintiff's need for surgery was greatly accelerated in time due to his symptomatology after the second accident.
Shortly after the December accident, plaintiff also began to experience a problem with leaking urine. A urologist, Dr. Robert Alexander, diagnosed plaintiff's incontinence to be caused by nerve damage in the cervical region. Dr. Alexander explained that the bulging discs put pressure on the spine causing nerve damage. Dr. Alexander prescribed a medication, ditropan, for plaintiff's condition. During subsequent examinations by Dr. Alexander, plaintiff reported that his incontinence is controlled substantially when he takes his medication. He explained that he has leaking every once in a while if he takes the medication but if he fails to take the medication, the leaking is regular. Dr. Alexander stated that since plaintiff's incontinence has not resolved itself in over a year, it is very likely going to be a long-term problem. Dr. Alexander also testified that the December accident appears to be the cause of plaintiff's incontinence since plaintiff's problem started immediately after the December accident. He stated that the aggravation of the bulging cervical discs could have precipitated the incontinence.
For approximately one year after surgery, Dr. Judice continued to treat plaintiff on a regular basis. Shortly after surgery, plaintiff's activities began to increase and he reported that he was not having neck pain or headaches. However, plaintiff complained of a stiff neck and he did not have a full range of motion in his neck.
In June of 1986, plaintiff returned to Dr. Judice complaining of neck pain and headaches. Dr. Judice examined cervical x-rays and reported that the "fusions looked good". An additional CT scan was performed to check the condition of the remaining bulging cervical disc that had not been dealt with in the January 1986 surgery. Conservative therapy of anti-inflammatory and anti-arthritic drugs was begun in an effort to rehabilitate plaintiff without surgery on the third bulging disc. From August through December of 1986, plaintiff returned to Dr. Judice complaining of neck pain. He reported having some good days and some bad days. As of December of 1986, Dr. Judice's restrictions for plaintiff's condition were: do not lift over 40 lbs., do not sit, stand or walk for over two hours without taking a break, do not wear heavy head gear, do not drive heavy equipment and do not work with head in an unusual position.
In January of 1987, plaintiff began seeing Dr. William H. Kinnard, an orthopedic surgeon. Plaintiff complained of neck and arm pain. Dr. Kinnard conducted a repeat myelogram test and nerve studies. The results of these tests indicated the need for an anterior cervical discectomy and disc fusion at the C-6/C-7 level. Plaintiff underwent this surgical procedure on February 4, 1987. After continued complaints of neck and arm pain subsequent to this surgery, Dr. Kinnard performed further nerve studies which indicated that plaintiff may have some permanent nerve problems because of his disc injuries.
After reviewing the previous CT scan and myelogram tests that were conducted after each automobile accident, Dr. Kinnard determined that the second accident was the cause of plaintiff's increased symptomatology which ultimately led to plaintiff's first surgery. Dr. Kinnard also stated his opinion that the need for the second surgery was brought about more by the December accident than the September accident. *651 He explained that a patient with minor bulging discs and a tolerable level of occasional pain and numbness can live a lifetime and not require surgery. Regarding plaintiff's future health, Dr. Kinnard testified that he is hopeful that plaintiff can return to light or moderate work. As of the time of trial, August of 1987, Dr. Kinnard had not yet discharged plaintiff. He explained that plaintiff continues to experience basically the same symptoms of pain and numbness that he experienced prior to undergoing the two surgical procedures.
Another neurosurgeon, Dr. Richard Levy, examined plaintiff on one occasion subsequent to the first cervical fusion surgery. Dr. Levy studied the CT scan and myelogram tests that were performed after each accident and determined that there was no appreciable difference between the first and second set of tests. In his opinion, plaintiff did not receive any significant injury in the second accident.
After reviewing all of the evidence, we find that plaintiff has established that the December 1985 accident was the sole cause of his incontinence. Plaintiff testified that his incontinence began subsequent to the second accident. Furthermore, the medical testimony confirmed that plaintiff's incontinence was consistent with the finding of increased bulging of the cervical disc subsequent to the second accident. We find that 100 percent of plaintiff's damages resulting from his incontinence are attributable to the December 1985 accident.
Additionally, we find that the facts clearly establish that the September 1985 accident caused cervical injury to plaintiff. However, the facts also clearly establish that the December 1985 accident aggravated plaintiff's cervical condition. Therefore, we must apportion the damages that were caused by each of the accidents in order to determine defendants' liability for plaintiff's cervical injury.
In situations involving multiple accidents, whether preceding or subsequent to the accident at issue, a tortfeasor is liable only for the direct and proximate results of his wrongful acts, including aggravation of any preexisting legal defects or injuries. Although a tortfeasor takes his victim as he finds him, the tortfeasor cannot be held liable for injuries which are not attributable to the wrongful act. Giesler v. United States Fidelity and Guar., 498 So.2d 292 (La.App. 4th Cir.1986); Williams v. Winn Dixie Louisiana, Inc., 418 So.2d 13 (La.App. 1st Cir.1982). In such situations, plaintiff is required to prove a causal connection between the damages claimed and the accident by a reasonable preponderance of the evidence. Geisler, 498 So.2d at 294.
The evidence presented in this case does not set forth a clear delineation of the damages that are attributable to each accident. Regarding plaintiff's cervical condition, plaintiff suffered from very similar symptoms subsequent to each accident. However, the record does establish that plaintiff's symptomatology was increased and intensified subsequent to the December 1985 accident. Additionally, the medical testimony establishes that plaintiff's need for surgery was greatly accelerated by the December 1985 accident. Also, there was at least some possibility subsequent to the first accident that plaintiff might be able to avoid surgery for the remainder of his lifetime. This possibility did not exist subsequent to the December 1985 accident, due to plaintiff's intractable pain which was caused by the aggravation of his condition. Based on these facts, we find that a fair and reasonable apportionment of the damages resulting from plaintiff's cervical injuries to the December 1985 accident is 50 percent of the total damages, except for the past lost wages award for the reasons given below.
To totally compensate plaintiff for the general damages he has suffered as a result of his cervical injuries would require an award of $150,000.00. After considering all of the facts and circumstances of this case, we conclude that an award of $150,000 is appropriate for the cervical injuries that the plaintiff received from the two accidents. See, for example, Oshinski v. Central National Insurance Company *652 of Omaha, 432 So.2d 929 (La.App. 4th Cir.), writ denied, 440 So.2d 148 (La.1983). Also see, Rickerson v. Fireman's Fund Ins. Co., 543 So.2d 519 (La.App. 1st Cir.1989); Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.), writ not considered, 437 So.2d 1135 (La.1983). In addition to extended periods of conservative therapy, plaintiff has undergone two surgical procedures. Yet, he still suffers from numbness and pain in his neck and arms. Plaintiff's activities will be restricted for the rest of his life. However, this award must be reduced to $75,000.00 since defendants are only responsible for 50 percent of the general damages for plaintiff's cervical condition. Therefore, plaintiff is awarded $75,000.00 general damages for his cervical injury and $50,000.00 in general damages for his incontinence, resulting in a total general damage award of $125,000.00.
Plaintiff submitted medical expenses that were attributable to his cervical condition in the amount of $11,545.87. Based on the allocation of 50 percent of plaintiff's damages to the second accident, we find that plaintiff is entitled to recover one-half of these expenses, $5,772.94. Plaintiff also established that he incurred medical expenses in the amount of $269.76 as a result of his incontinence. Plaintiff is awarded the full amount of these expenses. Thus, plaintiff's total award of medical expenses is $6,042.70.
The next element of damages to be addressed is past lost earnings. Plaintiff established that after the first accident he had returned to work and was performing most of his previous work duties. However, subsequent to the second accident, plaintiff returned to work for a period of time but was unable to perform his usual tasks. Plaintiff worked for his father and was paid his salary for an extended period of time after the second accident even though he was unable to do his work. About one year prior to the trial in this matter, plaintiff stopped drawing a salary. Plaintiff's earnings for this year would have been $18,071.00. The record supports a finding that plaintiff would have been able to continue working after the first accident and avoid surgery for a substantial period of time. Dr. Judice testified that the second accident greatly accelerated plaintiff's need for surgery. Therefore, we find that 100 percent of plaintiff's past lost earnings are attributable to the December 1985 accident. Accordingly, we award plaintiff the full amount of $18,071.00.
With respect to plaintiff's future lost earnings, a vocational rehabilitational specialist testified that plaintiff would not be able to return to his previous employment but that plaintiff should be able to perform a dispatcher job, inside sales work, inventory work or a purchasing job. She determined that he would be able to earn about $5.00 an hour. Based on this hourly wage, an economist projected plaintiff's future earning loss to be $164,550.00. Although plaintiff had not returned to work at the time of trial, he does not presently contend that he is unable to work. In brief, plaintiff prays for an award of $164,550.00 for his future lost earnings. We agree that this amount is a reasonable projection of plaintiff's total future lost earnings. However, since only 50 percent of plaintiff's future lost earnings is attributable to the December 1985 accident, we award $82,275.00 for plaintiff's future lost earnings.
Plaintiffs do not assign error to the jury's finding that Mrs. Sanders did not suffer loss of consortium as a result of the December 1985 accident. We note, however, that we have thoroughly reviewed the record with respect to this issue and find no manifest error in the jury's determination.
In summary, we find that Mr. Sanders is entitled to the following damages which are attributable to the December 1985 accident.

General damages....... $125,000.00
Medical expenses...... 6,042.70
Past lost wages....... 18,071.00
Future lost wages .... 82,275.00
 ___________
Total damages......... $231,388.70

Accordingly, it is ordered, adjudged and decreed that there be judgment herein against defendants, Jody T. Collins and Allstate *653 Insurance Company, and in favor of plaintiff, Gerald H. Sanders, Jr., in the sum of Two Hundred Thirty-one Thousand, Three Hundred Eighty-eight and 70/100 ($231,388.70) Dollars, together with legal interest thereon from date of judicial demand until paid.
It is also ordered, adjudged and decreed, that State Farm Mutual Automobile Insurance Company, in its capacity as plaintiffs' uninsured/underinsured motorist insurer, is dismissed from these proceedings.
It is further ordered, adjudged and decreed that all costs of these proceedings be borne by defendants, Jody T. Collins and Allstate Insurance Company.
REVERSED AND RENDERED.
CARTER, J., concurs in the result.
NOTES
[1] Although the release refers to an accident occuring on or about September 16, 1985, the parties agree that the first accident in question occurred on September 17, 1985. It is also undisputed that Allstate was the uninsured/underinsured motorist insurer of Gerald Sanders, Sr., plaintiff's father, for the period of July 27, 1985 to January 27, 1986. Both of the accidents in question occurred during this time period.