*JEW*

# STATE OF LOUISIANA

## COURT OF APPEAL

### FIRST CIRCUIT

* * * * * * *

2019 CA 1450

TAMATHA FAUL

VERSUS

LOUIS ROBINSON, ALLSTATE INSURANCE COMPANY, AND STATE
FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

JUDGMENT RENDERED:   **DEC 1 6 2020**

* * * * * * *

Appealed from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge • State of Louisiana
Docket Number C651273 • Division "25"

The Honorable Wilson E. Fields, Judge Presiding

* * * * * * *

| | |
|---|---|
| Marcus J. Plaisance<br>Mark D. Plaisance<br>Prairieville, Louisiana | ATTORNEYS FOR APPELLANT<br>PLAINTIFF—Tamatha Faul |
| Brian J. Prendergast<br>Joseph R. Cataldie<br>Baton Rouge, Louisiana | |
| Matthew L. Mann<br>Kellye R. Grinton<br>Kirk D. Pfefferle<br>Beau C. Garon<br>Baton Rouge, Louisiana | ATTORNEYS FOR APPELLEES<br>DEFENDANTS—Allstate<br>Insurance Company and Louis<br>Robinson |
| Michele Trowbridge Barreca<br>New Orleans, Louisiana | |

* * * * * * *

**BEFORE: MCCLENDON, WELCH, AND HOLDRIDGE, JJ.**

*Holdridge J. concurs*
*McClendon J. concurs with out reasons*

**WELCH, J.**

The plaintiff, Tamatha Faul, appeals a judgment rendered in accordance with a jury verdict, as well as a judgment denying a motion for judgment notwithstanding the verdict and alternative motion for new trial, after the jury found that she was not injured in a motor vehicle accident. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

The accident at issue occurred on September 19, 2015, when the 2016 BMW X4 owned and operated by Lawrence Faucheaux, was rear-ended by a 2002 Chevrolet Suburban owned and operated by the defendant, Louis Robinson. Mrs. Faul was a guest passenger in the backseat of the BMW, along with her stepdaughter Kelly Faucheux, Mr. Faucheux's wife. Mrs. Faul's husband, Robert Faul, was a guest passenger in the front seat. The Faucheuxes and Fauls had left the Faucheux residence and were in bumper-to-bumper LSU football game-day traffic on Gardere Lane in Baton Rouge when Mr. Robinson's suburban struck the BMW from the rear. Mr. Faucheux and Mr. Robinson's vehicles were insured by Allstate Insurance Company ("Allstate").

Mrs. Faul filed the instant suit against Mr. Robinson, Allstate (in its capacity as Mr. Robinson's liability insurer[1] and in its capacity as Mr. Faucheux's uninsured/underinsured motorist ("UM") insurer[2]), and State Farm Mutual Automobile Insurance Company, Mrs. Faul's UM insurer.[3] Mrs. Faul sought damages for cervical spine injuries allegedly sustained as a result of the motor vehicle collision.

---

[1] The Allstate policy covering Mr. Robinson's 2002 Chevrolet Suburban had liability limits of $500,000.00 per person/$500,000.00 per accident.

[2] On Plaintiff's motion, the trial court signed a judgment on December 13, 2016, dismissing all of the plaintiff's claims against Allstate in its capacity as Mr. Faucheux's UM insurer uninsurer, without prejudice.

[3] Pursuant to a joint motion of partial dismissal without prejudice, the trial court signed a judgment on November 28, 2016, dismissing all of the plaintiff's claims against State Farm Mutual Automobile Insurance Company, without prejudice.

The matter was tried before a jury on February 4-7, 2019, on the issues of liability and damages. At the conclusion of trial, the jury returned a 9-3 verdict finding that Mrs. Faul proved by a preponderance of the evidence that Mr. Robinson was at fault in causing the September 19, 2015 accident, but that Mrs. Faul was not injured as result of the accident. Accordingly, the jury did not award Mrs. Faul any damages. The trial court signed a judgment in conformity with the jury's verdict on March 4, 2019. Arguing that the jury's verdict was unreasonable and not supported by the evidence presented at trial, Mrs. Faul filed a motion for judgment notwithstanding the verdict ("JNOV"), or alternatively, a motion for new trial, which were denied by the trial court pursuant to a judgment signed on May 8, 2019. Mrs. Faul now appeals the trial court's March 4, 2019 and May 8, 2019 judgments.

## LAW

In a personal injury suit, liability is determined under the duty-risk analysis, which requires that the plaintiff prove: (1) the defendant had a duty to conform his conduct to a specific standard of care, (2) the defendant failed to conform his conduct to the appropriate standard of care, (3) the defendant's substandard conduct was a cause-in-fact of the plaintiffs injuries, (4) the defendant's substandard conduct was a legal cause of the plaintiffs injuries, and (5) actual damages. **Brewer v. J.B. Hunt Transport, Inc.**, 2009-1408 (La. 3/16/10), 35 So. 3d 230, 240. In order to recover, the plaintiff must prove, by a preponderance of the evidence, both the existence of the injuries and a causal connection between the injuries and the accident. **Richardson v. Bridgefield Casualty Insurance Company**, 2014-1587 (La. App. 1st Cir. 8/10/15), 181 So. 3d 61, 64 (citing **Kelley v. General Insurance Company of America**, 2014-0180 (La. App. 1st Cir. 12/23/14), 168 So. 3d 528, 543, writs denied, 2015-0157, 2015-0165 (La. 4/10/15), 163 So. 3d 814, 816).

It is well-settled that a tortfeasor takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. **Touchard v. Slemco Electric Foundation**, 99-3577 (La. 10/17/00), 769 So. 2d 1200, 1204. Nevertheless, the tortfeasor cannot be held liable for injuries which are not attributable to the tortious conduct or wrongful act. **Sanders v. Collins**, 551 So. 2d 644, 651 (La. App. 1st Cir. 1989), writ denied, 556 So. 2d 1261 (La. 1990). Thus, a tortfeasor is only liable for damages caused by his negligent act, not damages caused by separate, independent, or intervening causes. **Richardson**, 181 So. 3d at 64; **Kelley**, 168 So. 3d at 543. However, where it is established that the defendant's negligent action aggravated a pre-existing injury or condition, he must compensate the victim for the full extent of that aggravation. **Touchard**, 769 So. 2d at 1204.

On appeal, Mrs. Faul contends that she met her burden of proving that she suffered injuries as a result of the accident and that the jury's verdict to the contrary was manifestly erroneous because the unrefuted medical evidence demonstrated that her neck injuries were caused and/or aggravated by the accident. A jury's determination on causation, *i.e.*, whether an accident caused the plaintiff's injuries, is a factual question that should not be reversed on appeal absent manifest error. **Thongsavanh v. Schexnayder**, 2009-1462 (La. App. 1st Cir. 5/7/10), 40 So. 3d 989, 1001, writ denied, 2010-1295 (La. 9/24/10), 45 So. 3d 1074; see also **Detraz v. Lee**, 2005-1263 (La. 1/17/07), 950 So. 2d 557, 561. Under the manifest error standard, the appellate court does not decide whether the jury was right or wrong; rather it is required to consider the entire record to determine whether a reasonable factual basis exists for the finding, and whether the finding is manifestly erroneous or clearly wrong. **Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC**, 2014-2592 (La. 12/8/15), 193 So. 3d 1110, 1116.

4

Reasonable persons frequently can and do disagree regarding causation in particular cases. But where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. **Hayes**, 193 So. 3d at 1116. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the jury's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. **Rosell v. ESCO**, 549 So. 2d 840, 844 (La. 1989). Accordingly, appellate review of the factual circumstances and evidence of the case will not be the basis for reversal of the trial court's judgment, in the absence of manifest error, even if the court of appeal is convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. **Rosell**, 549 So. 2d at 844. The reviewing court must review the record in its entirety to determine whether the factfinder's finding was clearly wrong or manifestly erroneous. **Stobart v. State through Dep't of Transp. and Dev.**, 617 So. 2d 880, 882-83 (La. 1993).

The Louisiana Supreme Court applies a two-part test to determine if a factfinder's determinations warrant reversal: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). **Graves v. Page**, 96-2201 (La. 11/7/97), 703 So. 2d 566, 573.

Also at issue on appeal is the May 8, 2019 judgment denying Mrs. Faul's motion for JNOV and alternative motion for new trial. Louisiana Code of Civil Procedure article 1811 provides that a party may move for a JNOV and that a motion for new trial may be joined with the motion. A JNOV can be granted only when the trial court finds that reasonable minds could not reach a contrary verdict.

**Adams v. Parish of East Baton Rouge**, 2000-0424 (La. App. 1st Cir. 11/14/01), 804 So. 2d 679, 687, writ denied, 2002-0448 (La. 4/19/02), 813 So. 2d 1090 (citing **Davis v. Wal-Mart Stores, Inc.**, 2000-0445 (La. 11/28/00), 774 So. 2d 84, 89). The trial court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. **Adams**, 804 So. 2d at 687.

In general, the standard of review of a JNOV on appeal is twofold. First, we must determine whether the jury verdict is supported by competent evidence and is not wholly unreasonable. If the verdict is supported by competent evidence and not wholly unreasonable, then the trial court may not set it aside. To make this determination, we must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. **Daigle v. United States Fidelity and Guaranty Insurance Company**, 94-0304 (La. App. 1st Cir. 5/5/95), 655 So. 2d 431, 436.

## DISCUSSION

At trial, the jury was presented with evidence regarding the nature of the rear-end collision. Mr. Faucheaux, the owner and driver of the BMW, testified that at the time of the accident, he was stopped at a red traffic light at the intersection of Gardere Lane and Nicholson Drive in bumper-to-bumper post-LSU gameday traffic. Once the traffic light turned green, he proceeded slowly through the light, but because of the traffic, he had to come to a stop. At that point, the Suburban driven by Mr. Robinson, which was behind him, collided into his BMW. Mr. Faucheaux recalled that he "had [his] foot on the brakes" and that the "impact was

6

such that it actually jarred the car." Mrs. Faucheux testified that the BMW was "slam[med] out of nowhere," and that all the occupants were jolted. Mrs. Faul described the force of the collision as "severe" or "great." She testified that "all of a sudden, it was like bam right in the back of the car. I mean, it was like hard, hard. It was -- it was choomp -- you know, like shazam king of thing."

Mr. Faucheaux stated that the only visible damage to the BMW was indentations on the plastic bumper. However, once the plastic bumper was removed, more extensive damage was revealed, which he had to have repaired. Mr. Faucheaux was unable to remember how much he paid for the repairs.

Burnell Thompson, III, a Louisiana State Trooper and the investigating officer of this accident, described the damage to the front end of the Suburban and to the rear bumper of the BMW as "very minor." He testified that the Suburban and the BMW were drivable by the owners and did not have to be towed from the scene of the accident. Trooper Thompson further stated that Mrs. Faul reported to him that she may have possibly been injured, but she refused aid. Photographs of the BMW taken after the collision reflect scratches and indentations on the bottom portion of the rear bumper.

Mrs. Faul testified that immediately following the accident, she felt pain in her neck "like it was going up the back of [her] head," and she knew that she was about to have a headache. However, she refused medical treatment at the scene of the accident and went with her husband and the Faucheuxes to a bar and grill at a nearby casino to watch another football game. Mrs. Faul testified that "[i]t didn't seem like it was an emergency situation" and that she "just kind of hurt [her] head." The group later left the casino because Mrs. Faul's head "got to hurting really bad."

The evidence established that Mrs. Faul had a long-standing history of neck and back pain prior to the accident and had been involved in accidents both before

7

and after the September 2015 accident. It was undisputed that Mrs. Faul, who was forty-seven years old at the time of the accident, suffered from chronic neck and back pain. Mrs. Faul first suffered injuries to her neck and back when as a pedestrian, she was struck by a motor vehicle in June 2004. Her primary complaint following that accident was neck and back pain. She filed a lawsuit regarding the 2004 accident, which was settled out of court.

Dr. Martin A. Langston, a specialist in physical medicine, rehabilitation, and pain management, treated Mrs. Faul following her 2004 accident on a referral from her primary physician, Dr. Jeri Johnson. From the 2004 accident until the 2015 accident, Dr. Langston treated Mrs. Faul's neck and back pain "conservatively" by performing diagnostic testing, trigger point injections, cervical and lumbar epidural steroid injections ("ESIs"), radiofrequency ablations ("RFAs"), medial branch blocks, electromyograms ("EMGs"), nerve conduction studies, and other treatment and tests on an intermittent basis. Mrs. Faul also underwent three cervical MRIs during this time: in 2004, in 2011, and on June 21, 2014. Dr. Langston testified that Mrs. Faul's three cervical MRIs showed common, degenerative changes.

Three months prior to the accident at issue herein, Mrs. Faul underwent cervical and lumbar ESIs, and she reported lingering cervical pain at her follow-up visit with Dr. Langston on June 22, 2015. Five days prior to the accident herein, Mrs. Faul saw Dr. Langston on September 14, 2015, for an unscheduled visit after she injured herself while exiting a vehicle. She complained of lower back pain, buttock pain, hip pain, and lower extremity pain. However, at trial, Mrs. Faul's counsel referred to her preexisting neck pain as a "little pesky medical problem." Mrs. Faul testified that she "was doing fine" before the accident. She described Dr. Langston's treatment of her cervical and lumbar spine as treatment of "aches and pains."

Mrs. Faul testified that three days after the September 19, 2015 accident, she called a nurse at her primary care physician's office to report her injuries "in case [she] needed to get a refill or something …a muscle relaxer…." On September 29, 2015, ten days after the accident, Mrs. Faul visited her primary care physician, Dr. Jeri Johnson, but made no mention of the accident or of any injuries to her neck or back.

On October 7, 2015, three weeks post-accident, Mrs. Faul complained of neck and back pain to Dr. Langston at a visit that was scheduled prior to the accident. She informed Dr. Langston that she had been involved in an accident, but that she had also aggravated her neck and back pain while performing regular household duties. At that visit, Mrs. Faul indicated that her pain level was a 5 out of 10. Dr. Langston performed trigger point injections into her muscles for immediate relief and ordered a lumbar MRI.

Mrs. Faul returned to Dr. Langston on October 29, 2015, for a follow-up visit and had X-rays performed, which showed no disc bulging/herniation or ligament laxity, only muscle spasms. Dr. Langston scheduled a cervical ESI and prescribed a muscle relaxer and pain medication. Mrs. Faul indicated that her pain level was a 3 out of 10. She had the cervical ESI on November 20, 2015. Approximately four months later, on February 18, 2016, Mrs. Faul returned to Dr. Langston complaining of increased lower back pain. Dr. Langston prescribed a muscle relaxer and pain medication and scheduled trigger point injections. During his deposition, Dr. Langston testified:

> Q: Her conditions really weren't changing … any? It wasn't getting any better in February of '16?
> A: She was, yes, still having some flare-ups of neck and back pain.
> Q: Okay. The same sort of complaints that she had had since going back to 2004?
> A: Correct.

9

Dr. Langston saw Mrs. Faul on May 9, 2016, where she complained of mainly left shoulder pain. He prescribed anti-inflammatory medication and muscle relaxers and scheduled a cervical MRI, EMG, and nerve conduction studies. The cervical MRI, performed on May 16, 2016, showed no changes from her MRIs prior to the accident.

On Dr. Langston's recommendation, Mrs. Faul went to see Dr. Richard Allen Stanger on May 19, 2016. At that visit, she complained of back pain, neck pan, pain radiating into her left arm, pain in her left leg, numbness in her fourth and fifth digits, and tingling in her hand. Mrs. Faul indicated to Dr. Stanger that she had been in a motor vehicle collision in September 2015, and that her pain was worse following the accident. Recognizing that Mrs. Faul's symptoms had been ongoing for a long time, Dr. Stanger indicated that she could continue with the ESIs or consider surgery. Mrs. Faul opted for surgery—an anterior cervical discectomy and fusion, which Dr. Stanger performed in June 2016. The surgery fused two levels in her cervical spine C-5 to C-7. Dr. Stanger initially wanted to fuse three levels, C-5 to T-1, but was unable to access the bottom T-1 level. At her first post-operative visit on June 14, 2016, Mrs. Faul reported worsening symptoms; however, she admitted that she had fallen while trying to change a light bulb prior to this visit. Dr. Stanger indicated that it was possible the fall could have aggravated the non-fused cervical level that soon after her surgery. He ordered a cervical MRI, which was performed on July 21, 2016, and it showed no disc herniation.

Following her cervical discectomy and fusion with Dr. Stanger, Mrs. Faul returned to Dr. Langston on July 14, 2016, reporting radicular pain to the left upper extremity. She also told Dr. Langston that she had fallen and injured herself. Dr. Langston recommended that Mrs. Faul return to Dr. Stanger and continue her pain medication. Mrs. Faul returned to Dr. Stanger on July 26, 2016, and he

10

recommended a CT scan, which was performed that same day, based on her continuing and worsening post-operative pain. On August 24, 2016, Dr. Stanger then performed a second surgery on Mrs. Faul, a C7-T1 laminectomy, to fuse the third level that he was unable to fuse during her first surgery. After the second surgery, Mrs. Faul's surgical wound became infected, and she was ultimately admitted to the hospital to drain fluid from the infected wound. Mrs. Faul then returned to Dr. Stanger for follow up visits regarding her wound infection on September 15, 20, and 27, 2016. On later visits with Dr. Stanger on October 11 and 25, 2016, December 1, 2016, January 5, 2017, and May 11, 2017, Mrs. Faul reported neck pain, numbness in her fourth and fifth digits, left arm pain, back pain, pain in both lower extremities, pain in her left leg, and pain in her right ankle. Dr. Stanger recommended conservative treatment for her back pain, including injections and possibly surgery to decompress nerves in an attempt to alleviate her arm pain and finger numbness.

Mrs. Faul then returned to Dr. Langston on November 3, 2016, complaining of some residual posterior cervical pain, and pain to the mid and upper thoracic region that was caused by muscle spasms. Dr. Langston continued her on muscle relaxers and pain medication and her exercise program per Dr. Stanger. Mrs. Faul saw Dr. Langston's physician's assistant on September 13, 2017, where she complained of increased, aching neck pain. Dr. Langston's office continued her on pain medication and physical therapy.

Mrs. Faul, relying on the testimony of Dr. Langston and Dr. Stanger, maintains that the evidence established a causal link between her complaints of pain and the September 19, 2015 automobile collision. Dr. Langston specifically testified during his deposition that he referred Mrs. Faul to Dr. Stanger because she had unresolved complaints that were aggravated by the September 19, 2015

11

accident. However, Dr. Langston deferred to Dr. Stanger as to the degree or extent of aggravation or exacerbation.

During Dr. Stanger's deposition, the following exchange occurred:

> Q: Can you say in your medical opinion that had the September 19, 2015 motor vehicle accident not occurred, that she would not have needed the surgery that she had in -- I guess it was two surgeries in 2015?
> A: It really [would] just depend on her -- honestly, it would be her symptoms, you know, because people can have a terrible-looking MRI. If they're feeling fine, we're not going to do surgery.
> Q: ... [H]ow did this accident -- if you can tell us -- if you can't tell us, I just need to know you can't say -- but based upon what you know today, your history, what she's given you, the limited history that you have identified about her going back to 2004, and everything that's changed since you first saw her with the two surgeries, et cetera, et cetera, can you tell us that you feel that because of the motor vehicle accident September 2015, you're relating the need for surgery to that event? Do you feel comfortable about making that connection?
> A: The way I phrase it is, you know, if her symptoms were very manageable before the accident, and she's going along fine with conservative treatment, and she's doing fine, and then the accident occurs -- because when I saw her, her symptoms were not manageable. She was in terrible pain. And there's no way -- from what I saw there, there's no way she would have been doing that for 6 years, you know, been fine with the amount of pain that she was in. So I would say the amount of pain that I saw her in when I first saw her, I would say she wasn't in that amount of pain before. I would say the accident did precipitate the need for surgery based on her symptoms then.
> Q: Your decision to operate on [Mrs.] Faul in June of 201[6], was because those symptoms had risen to that level, that she could no longer manage it?
> A: Yes.

The jury also heard the deposition expert medical testimony of neurosurgeon Dr. Najeeb Thomas, who performed an independent medical examination of Mrs. Faul's medical records. Though Dr. Thomas never performed a physical examination of Mrs. Faul, he had access to her complete medical history. Dr. Thomas, noting Mrs. Faul's extensive history and worsening MRIs, testified that

while the September 19, 2015 accident may have aggravated Mrs. Faul's chronic neck pain, she would have required cervical surgery regardless of the accident.

The trier of fact's credibility determinations, even when based on the depositions of experts offered in lieu of live testimony, are accorded great deference. Further, in reaching its conclusions, the trier of fact need not accept all of the testimony of any witness as being true or false and may believe and accept a part or parts of an expert witness's testimony and refuse to accept other parts. These rules apply equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. **Landry v. Doe**, 2019-0880 (La. App. 1st Cir. 6/26/20), ___ So.3d ___, ___, 2020 WL 3481703, at *5, writs denied, 2020-00952, 2020-00948 (La. 10/20/20), 303 So. 3d 313, 316.

The weight afforded a treating physician's testimony is largely dependent upon the facts upon which his opinion is based. **Edwards v. State Farm Mutual Automobile Insurance Company**, 2010-2216 (La. App. 1st Cir. 5/6/11), 2011 WL 2617384, at *3 (unpublished); **Wells v. Allstate Insurance Company**, 510 So.2d 763, 768 (La. App. 1st Cir.), writ denied, 514 So. 2d 463 (La. 1987). The plaintiff's credibility is especially significant when a physician must relate a medical condition to an accident based on the plaintiff's history. See **Peters v. Harmsen**, 2003-1296 (La. App. 1st Cir. 4/2/04), 879 So. 2d 157, 162. A plaintiff's lack of credibility on factual issues can serve to diminish the veracity of his complaints to a physician. **Meneses v. IFCO Systems, Inc.**, 2004-1686 (La. App. 1st Cir. 9/23/05), 923 So. 2d 111, 117; **Peters**, 879 So. 2d at 162. Thus, in many cases, the credibility of the history given by the plaintiff to her physicians becomes as important as the medical opinions based on that history. **Meneses**, 923 So. 2d at 116-17.

It is apparent, from our review of the record, that Mrs. Faul's credibility was the critical issue at the trial and that the jury rejected her testimony. Furthermore,

13

Mrs. Faul's credibility (or lack thereof) affected not only her testimony, but also the medical opinions of her doctors regarding the causal relationship between the accident and the alleged injuries. See **Richardson**, 181 So. 3d at 68, **Meneses**, 923 So. 2d at 116-17, and **Peters**, 879 So. 2d at 162. Causation in this case rested largely on Mrs. Faul's credibility both in reporting her medical condition and her level of pain to her treating physicians. The jury was presented with evidence of numerous accidents in which Mrs. Faul had been involved that could have accounted for her complaints of pain—the 2004 accident, when she injured herself while exiting a vehicle (sometime in early September 2015 before the accident), and when she fell while trying to change a light bulb (sometime in June 2016 after the accident and first surgery). The jury apparently concluded that Mrs. Faul suffered no increase in her chronic pain after this accident and the record reasonably supports the jury's conclusion in this regard. Thus, we cannot say that the jury's failure to find that Mrs. Faul sustained injuries or that her pre-existing condition was aggravated from the September 19, 2015 accident was manifestly erroneous. See **Hayes**, 193 So. 3d at 1116; **Edwards**, 2011 WL 2617384, at *3. Since the jury's finding that Mrs. Faul was not injured as result of the accident was reasonably supported by the record, its failure to award damages to Mrs. Faul was, likewise, neither manifestly erroneous nor clearly wrong. As such, the trial court properly denied Mrs. Faul's motion for JNOV and, alternatively, motion for new trial. The assignments of error directed at these findings are without merit.

### DECREE

For the foregoing reasons, we affirm the March 4, 2019 and the May 8, 2019 judgments of the trial court. All costs of this appeal are assessed to the plaintiff, Tamatha Faul.

**JUDGMENTS AFFIRMED.**

14